AMERICAN GRAPHOPHONE CO. v. GIMBEL BROS.

(District Court, S. D. New York. June 2, 1916.)

No. 199.

1. PATENTS ⬤⇒328—VALIDITY AND INFRINGEMENT—SOUND-RECORD.
    The Macdonald patent, No. 714,651, for a sound-record and method of forming the same, is limited by the proceedings in the Patent Office to a record in forming which the tablet on which it is cut is revolved at a surface speed of approximately 44 meters per minute; also *held* not infringed.

2. PATENTS ⬤⇒168(2)—CONSTRUCTION.
    Courts should not, by construction, enlarge a claim of a patent which the Patent Office had admitted after imposing limitations which the patentee acquiesced in, beyond the fair interpretation of its terms.
    [Ed. Note.—For other cases, see Patents, Cent. Dig. § 244; Dec. Dig. ⬤⇒168(2).]

3. PATENTS ⬤⇒232—INFRINGEMENT—PROCESS PATENT.
    A purchaser in the open market of a product which has been made in infringement of a patented process cannot be held liable as an infringer.
    [Ed. Note.—For other cases, see Patents, Cent. Dig. § 365; Dec. Dig. ⬤⇒232.]

4. PATENTS ⬤⇒234—INFRINGEMENT—PATENT FOR PROCESS AND PRODUCT.
    Where a patent includes claims for a process and also for the product of such process, the latter are to be construed in connection with, and are limited in scope by, the former, and are not infringed unless the process claims are also infringed.
    [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 370, 381; Dec. Dig. ⬤⇒234.]

In Equity. Suit by the American Graphophone Company against Gimbel Bros. On final hearing. Decree for defendant.

S. T. Cameron, C. A. L. Massie, and Ralph L. Scott, all of New York City, for plaintiff.

Charles N. Butler, of Philadelphia, Pa., and Frederick P. Fish, of Boston, Mass., for defendant.

THOMAS, District Judge. [1] This case arises on a final hearing of a bill in equity on pleadings and proofs, charging the defendant with infringement of letters patent of the United States No. 714,651, dated November 25, 1902, for a new and useful improvement in recording and reproducing sounds. The patentee in his specification states that the invention relates to the art of recording and reproducing sounds, and that its object is to obtain complete and accurate records and reproductions of articulate speech and of all other sounds, practically the same in volume and tone-color as the original sounds. The patentee then goes on to state that it has long been realized by those skilled in the art that the best reproductions of sound obtained by the method patented by Bell & Tainter in 1886, and now in general use, besides being very small in volume compared with the original sounds, differed therefrom in character to a greater or less degree, and that these differences have been recognized as of two principal sorts: First, the absence of components characterizing the original sounds (especial-

ly noticeable in closed sounds, aspirates, sibilants, and high-pitched sounds); and, second, the presence of foreign sounds or characters. The latter difficulty has been attributed to various causes, generally to so-called "false vibrations," but after every effort to overcome these difficulties, and to eliminate false vibrations, the characteristic differences stated above, distinguishing the reproduced from the original sounds, still remained very strongly marked, and that the complete result of sound reproduction involves two operations: First, the making of the record; and, second, the reproduction of the recorded sound. Later on in his specification the patentee says (page 3, lines 105, et seq., and page 4, lines 1 to 12 inclusive):

"In the practical making of sound-records prior to the present invention, the record tablets have usually been in the form of cylinders of wax-like material, about one-half decimeter in diameter, revolving at about one hundred and ten revolutions per minute, giving a surface speed to the tablet of about one hundred and seventy-five decimeters, in round numbers. By the present invention the surface speed of the tablet is such as to give the revolving diaphragm perfect freedom of vibration without any damping effect due to the contact of the undulation with the heel of the stylus. The requisite surface speed might be attained by increasing the number of revolutions per minute given to cylinders one-half decimeter in diameter, or thereabout, as heretofore employed. There are practical objections to this, however, and it is therefore preferable to drive the cylindrical tablet at the same number of revolutions viz., about one hundred and ten per minute, and to so increase the diameter of the tablet as to secure the requisite surface speed, and it has been found that a cylinder about one and one-fourth (1.25) decimeters in diameter will attain a sufficient surface speed when revolved at the rate mentioned. Obviously the same results might be obtained by increasing the number of revolutions and making the diameter less than one and one-fourth (1.25) decimeters or by decreasing the number of revolutions and increasing the diameter of the tablet, and such changes would come within the scope of this invention, the essential feature of which is that the surface speed must be such as to permit the diaphragm to make its full sweep without any contact between the heel of the recording-style and the crests of the undulations."

The patent contains seven claims and the charge of infringement is restricted to claims 3, 5, and 6, which are as follows:

"3. The method of forming a sound-record which consists in placing a vibratory cutting-style in contact with a tablet, causing said style to vibrate in a plane approximately perpendicular to the surface of the tablet by impressing sonorous vibrations thereon, and simultaneously moving said tablet at such a speed that sounds requiring one minute in their production form a record approximately forty-four meters in length."

"5. A sound-record consisting of a tablet of wax or wax-like material having an undulatory sound-groove cut or engraved therein, said undulations being of great and varying amplitude and having long, gentle, easy slopes, thereby giving reproductions sensibly equal in volume to the original sounds.

"6. A sound-record consisting of a tablet having a sound-groove with undulations of varying depth, said undulations being of such lengths that sounds occupying one minute in their production form a record approximately forty-four meters in length."

The charge of infringement relates to art composition disks known in the market as "Pathe," "Rex," and "Keen-o-phone," containing vertically undulating spiral curves, successively reproduced at increasing speed, the records being formed by molding the soft impression from a matrix with the aid of hydraulic pressure and hardening the molten products. The defendant purchased its records in the open

market ready made, and without any knowledge on its part as to how they were made, and no evidence has been introduced, other than a claimed inference or conjecture, as to the complete process by which these records were made, although there is some evidence that the different records were made by different operations; and no evidence has been offered to connect the defendant, either directly or indirectly, with the manufacture of the records. The defenses are noninfringement, nonpatentability, and anticipation. The application for the patent was filed on December 5, 1898, and contained seven claims, as follows:

"1. The method of forming a sound-record which consists in placing a vibratory recording-style in contact with a record tablet and simultaneously impressing sonorous vibrations upon the style and imparting movement to the tablet with a surface speed sufficient to cause the style to form in the tablet undulations with long gentle slopes as contradistinguished from short, abrupt undulations, substantially as described.

"2. The method of forming a sound-record which consists in placing a vibratory cutting-style in contact with a record tablet, impressing sonorous vibrations upon the style, and simultaneously moving the tablet relative to the style with a surface speed sufficient to prevent the heel of the style from making contact with the undulations, substantially as described.

"3. The method of forming a sound-record which consists in placing a vibratory cutting-style in contact with a wax or wax-like record tablet at a small angle with the tangent at the point of contact and simultaneously impressing sonorous vibrations upon the style and moving the tablet with a minimum surface speed of about 44 meters per minute, substantially as described.

"4. The method of forming a sound-record which consists in placing a vibratory cutting-style in contact with a suitable tablet, impressing sonorous vibrations upon the style and decreasing the resistence offered by the tablet to the cutting action of the style by imparting a high surface speed to the tablet, and thereby cutting long, deep undulations in the record-groove, substantially as described.

"5. A sound-record, having the record-groove formed with undulations having long, gentle, easy slopes as contradistinguished from short, abrupt undulations, substantially as described.

"6. A sound-record, having the record-groove cut or engraved in a tablet of wax or wax-like material, the undulations of the record having long, gentle, easy slopes as contradistinguished from short, abrupt undulations, substantially as described.

"7. The sound-record formed by engraving substantially as herein described, said record corresponding in amplitude and character to the vibrations of the sound-wave, and being characterized by long gradual slopes, and by the absence of abrupt curves and sharp slopes, substantially as described."

The first action of the Patent Office was on January 18, 1899, when the examiner in charge of the application informed the applicant that claim 3 was objectionable because the cutting-style places at a small angle with a tangent at the point of contact was descriptive of an element of the mechanism by which the process is carried out, and should not be recited in a process or method claim, and that such description renders it uncertain whether applicant regards the essence of the application covered by this claim to reside in the particular mechanism or the method. Claims 1 to 4 were rejected because they did not distinguish from the ordinary and well-known method of forming graphophone records, the only difference specified being in the speed with which the surface of the tablet is driven, a speed variously defined in

the several claims, and because also the effect of an increase in the speed of the tablet in forming and reproducing sound-records appears to be understood from any one of the following publications and prior uses: (1) The article in the International Encyclopedia, published in 1898, entitled "Phonograph"; (2) the British patent to Thomas A. Edison, No. 1644, of April, 1878, for graphophones, wherein was shown a means for producing a phonograph record by driving the tablet at a high speed and forming deep undulations therein; (3) the talking-machines of commerce have long been provided with governors, which include adjustable means for varying the speed of the tablets, they being run sometimes at a high and sometimes at a low speed; (4) the ordinary gramophone of commerce is usually run at a speed of 70 turns a minute, according to the printed instructions accompanying it, and is provided with a governor capable of being speeded considerably higher, and that at 70 turns a minute, the outer spirals of a diameter of about 6½ inches, would have a speed of about 38 meters a minute, and that these claims simply show the carrying forward or more extended use of an original idea, a mere improvement in degree.

Claims 5, 6, and 7, as originally filed, were also rejected on the ground that they did not distinguish from the ordinary record, and also for the reason that these original claims were anticipated by the British patent to Edison, to which reference has been made. The applicant thereupon amended his claim by erasing claims 1 and 2, and substituting therefor the following:

"1. The method of forming a sound-record which consists in placing a vibratory recording style in contact with a record tablet and simultaneously impressing sonorous vibrations upon the style and imparting to the tablet a high surface speed sufficient to cause the style to form in the tablet undulations of relatively great amplitude with long, gentle slopes as contradistinguished from short, abrupt undulations, substantially as described.

"2. The method of forming a sound-record which consists in placing a vibratory cutting-style in contact with a record tablet, at an acute angle, impressing sonorous vibrations upon the style and simultaneously moving the tablet relative to the style with a surface speed sufficient to prevent the heel of the style from making contact with the undulations, and to cause the style to cut continuously a record corresponding in form to the sound-waves, substantially as described"

—and by erasing claims 4, 5, 6, and 7, as originally filed, and substituting in their place the following:

"4. A sound-record having the record-groove formed with undulations having long, gentle, easy slopes as contradistinguished from short, abrupt undulations, the undulations corresponding approximately in amplitude to the acoustical vibrations, substantially as described.

"5. A sound-record having the record-groove cut or engraved in a tablet of wax or wax-like material, the undulations of the record having long, gentle, easy slopes as contradistinguished from short, abrupt undulations, and giving reproductions sensibly equal in volume to the original sounds, substantially as described.

"6. The sound-record formed by engraving substantially as herein described, said record corresponding in amplitude and character to the vibrations of the sound-wave, giving reproductions sensibly equal in volume to the original sounds, and being characterized by long, gradual slopes, and by the absence of abrupt curves and sharp slopes, substantially as described."

This amendment was accompanied with an elaborate written argument by the applicant's solicitor, and the report of a microscopical study made by Arthur J. Hall, M. D. Following the receipt of these claims by the Patent Office, there was an oral discussion of the claims between the examiner and Mr. Mauro, the applicant's solicitor, with a view to distinctly bringing out and defining applicant's invention, in which the examiner called Mr. Mauro's attention to an article on the "Improved Graphophone," found on page 80 of the Electrical World for August 18, 1888, in which the statement appears that a record disk some 12 inches in diameter was designed to be run at a speed of 40, 50, or 60 revolutions a minute, and thereupon the specification was amended, the object of this latter amendment being to point out in the specification what is meant by "high speed," and to also clearly indicate how to impart a speed to the tablet which will prevent the heel of the style from making contact with the crests. A short time after this, the specification was again amended. Thereupon the examiner rejected the amended claims on the ground that they were not distinguishable in anything patentable in an art which had already reached a high state of development and perfection, and whatever improvement the applicant had made was that his result was better than a common result which was already good, and this rejection was accompanied with the suggestion that a claim for "a sound-record consisting of an undulating groove engraved or cut in a wax or wax-like tablet, the undulations being of such lengths that sounds requiring one minute of time to make them would require not less than approximately forty-four (44) meters of groove to record them," would distinguish his invention from the prior art. Following this letter of rejection, the applicant again amended his specification by striking out part of his amended specification, and substituting therefor what is found on page 2 of the printed patent as granted at lines 88–104, as follows:

"With a cylindrical recording-style the position of the heel of the style will be determined by the angle which the axis of the style forms with the plane of the recording-surface (or to the tangent, if it be a cylinder), and I shall hereinafter refer to the angle which the axis of the style forms with said recording-surface or with said tangent as determining the position of the heel and cutting edge of the style; but it is to be understood that in so doing I do not limit myself to a cylindrical style, as a wedge or other shaped style may be advantageously employed, in which case the angle which the heel of the style forms with the surface of a flat tablet or the tangent of a cylindrical tablet will determine its position."

There were one or two other slight changes in the specification, and an erasure of claims 4, 5, and 6 as amended, and the substitution in their place of the following:

"4. The method of forming a sound-record which consists in placing a vibratory cutting-style in contact with a tablet, causing said style to vibrate in a plane approximately perpendicular to the surface of the tablet by impressing sonorous vibrations thereon, and simultaneously moving said tablet at such a speed that sounds requiring one minute in their production form a record approximately forty-four meters in length.

"5. A sound-record consisting of undulations of varying depth, said undulations being of great amplitude and having long, gentle, easy slopes as contradistinguished from a record of the same sounds having relatively shallow, short and abrupt undulations.

"6. A sound-record consisting of undulations of varying depth cut or engraved in a tablet of wax or wax-like material, said record giving reproductions sensibly equal in volume to the original sounds, and having long, gentle, easy slopes as contradistinguished from a record of the same sounds having relatively short, abrupt undulations.

"7. A sound-record consisting of undulations of varying depth, said undulations being of such lengths that sounds occupying one minute in their production form a record approximately forty-four meters in length."

Accompanying this amendment was a written argument from Mr. Mauro. The Patent Office then rejected claims 1, 5, and 6 as stated in the last amendment: First, for want of novelty, a ground of rejection which had been more especially emphasized in an office letter, in which it was shown that graphophone records have been formed at speeds differing widely from one another, and resulting necessarily in undulations of different lengths, having slopes of different degrees of abruptness; and, second, for lack of invention, in that the invention recited a change in the prior art only in the matter of degree.

This rejection was followed by two affidavits, one from Andrew Devine, who had had large practical experience in the talking-machine art, and one from Alexander Graham Bell. There was also an affidavit from the patentee himself, and a further one from Mr. Easton, the president and general manager of the plaintiff corporation. The purpose of these affidavits was to show that the change in degree accomplished a result not heretofore known in the art, but which had been the object and aim of those most keenly interested in the advancement of the art to attain, and this involved invention. Along with these affidavits, Mr. Mauro again submitted an elaborate written argument, whereupon there was another rejection by the Patent Office. Claims 5 and 6 as substituted, being again rejected for the reasons of record, and claims 1, 2, and 3 being rejected on newly discovered references, particularly No. 520,106 to Cox, granted May 22, 1894, for telephones, etc., which, viewed in connection with the patent to Edison No. 454,941, appeared to anticipate the claims as at present drawn, and not meeting the spirit of the applicant's inventions. There was also an objection to claim 6 as then substituted, on the ground that the volume of the reproductions is not a function of the record alone, but also of the reproducing appliances, together with the suggestion that if this claim was so drawn as to use the phrase, "giving reproductions sensibly equal in volume to the original sounds," as a means for defining the length and amplitude of the vibrations rather than the record itself, "the objection might be removed." The examiner then suggested a claim as follows:

"A sound-record consisting of undulations of varying depth cut or engraved in a tablet of wax or wax-like material, said undulations being of great amplitude and having long, gentle, easy slopes, thereby giving reproductions sensibly equal in volume to the original sounds."

The applicant was then advised by the examiner that claims 4 and 7 appeared to be allowable, and that claims 2 and 3 might be allowed if applicant would frame them so as to restrict them to the production of an original record, thus avoiding the Cox patent. Following

this rejection, there was a further amendment by erasing claim 1 and substituting in its stead the following:

"1. The method of forming a sound-record which consists in placing a vibratory cutting-style in contact with a record tablet and simultaneously vibrating the style by the action of sound-waves and imparting to the tablet a high surface speed, thereby forming undulations of great amplitude with long, gentle, easy slopes, as contradistinguished from a record of the same sounds having short, abrupt undulations"

—and by substituting, in accordance with the suggestion of the Patent Office, a new claim—the present claim 5 of the patent. Following this, there was a further rejection of claim 7 as drawn. Subsequently the applicant, with one or two formal amendments to his specification, and after an interference had been declared with one Leon F. Douglass, of Chicago, Ill., the issue involved being the method of forming a sound-record which consists in placing a vibratory cutting-style in contact with a tablet, causing said style to vibrate in a plane approximately perpendicular to the surface of the tablet by impressing sonorous vibrations thereon, and simultaneously moving said tablet at such a speed that sounds requiring one minute in their production form a record approximately 44 meters in length, amended the application so as to take the case from out the interference proceedings, and the claims were renumbered and the patent issued.

It is also to be noticed, as a part of the history of the patent in suit, that public use proceedings were begun on the application of the National Phonograph Company, supported by affidavits of Edison, Miller, Worth, and Ott, to prior knowledge and use, upon which the Commissioner of Patents held that a prima facie case of prior public use had been made out.

The history of the Macdonald patent, as shown in the file wrapper and contents as above recited, clearly demonstrates that Macdonald's advance in the art is a process and product consisting of the use of, and limited to, a uniform and critical speed of 44 meters per minute. It was clearly the purpose of the Patent Office, in granting the patent, to limit Macdonald by his representations that his sole discovery, in view of the prior art, was a uniform critical speed of 44 meters, which, as Macdonald and his solicitor insisted, involved something different from and more than a change of degree, and that any substantial departure from that speed in either direction resulted in deterioration.

[2] The answers and declarations of Macdonald and his attorney in the Patent Office and the amendments which related to the essence of the alleged improvements, and which were directed to the question of invalidity, were understandingly and deliberately made and assented to by him and his experienced solicitor, and the patent was granted with this avowed understanding by Macdonald and his solicitor. Macdonald had an opportunity to appeal from the decision of the examiner, but he did not. He therefore must be held to have been bound by it. It was the purpose of the Patent Office to limit Macdonald to a process or product involving a uniform, critical speed of 44 meters, and Macdonald is bound by that limitation. Computing

Scale Co. v. Automatic Scale Co., 204 U. S. 609, 617, 621, 27 Sup. Ct .307, 51 L. Ed. 645; Singer Mfg. Co. v. Cramer, 192 U. S. 265, 24 Sup. Ct. 291, 48 L. Ed. 437; Sargent v. Hall Safe & Lock Co., 114 U. S. 63, 86, 5 Sup. Ct. 1021, 29 L. Ed. 67; Shepard v. Carrigan, 116 U. S. 593, 598, 6 Sup. Ct. 493, 29 L. Ed. 723; Roemer v. Peddie, 132 U. S. 313, 317, 10 Sup. Ct. 98, 33 L. Ed. 382; Knapp v. Morss, 150 U. S. 221, 224, 14 Sup. Ct. 81, 37 L. Ed. 1059; Morgan Envelope Co. v. Albany Paper Co., 152 U. S. 425, 429, 14 Sup. Ct. 627, 38 L. Ed. 500; Greene v. Buckley, 135 Fed. 531, 68 C. C. A. 70.

This rule that courts should not, by construction, enlarge the claim which the Patent Office has admitted and the patentee acquiesced in beyond the fair interpretation of its terms, is nowhere better stated than by Mr. Justice Bradley, speaking for the Supreme Court in Burns v. Meyer, 100 U. S. 671, 672 (25 L. Ed. 738):

"It is well known that the terms of the claim in letters patent are carefully scrutinized in the Patent Office. Over this part of the specification the chief contest generally arises. It defines what the office, after a full examination of previous inventions and the state of the art, determines the applicant is entitled to. The courts, therefore, should be careful not to enlarge, by construction, the claim which the Patent Office has admitted, and which the patentee has acquiesced in, beyond the fair interpretation of its terms."

And this brings us to the substantial question involved, Has the defendant infringed the claims in controversy by purchasing, in the open market, records ready made without knowledge on its part as to how they were made, and without any charge or pretense that the defendant has been guilty of any act of contributory infringement? Claim 4 is, in express terms, for a process or method. A process is a mode of treatment of certain materials to produce a given result. As was said by Mr. Justice Bradley in Cochrane v. Deener, 94 U. S. 780, 788 (24 L. Ed. 139):

"It is an act, or a series of acts, performed upon the subject-matter to be transformed and reduced to a different state or thing."

The alleged infringing records were, according to the plaintiff's contention, molded and not made by moving a "tablet" at such a speed "that sounds requiring one minute in their production require approximately 44 meters in length" as claim 3 requires, uniform and critical speed for which the patent was granted, and there is nothing before me in the record which warrants me in finding the steps by which these records were manufactured.

[3] But a process patent is not infringed by selling the product, and the vendee of a product which has been made in infringement of a patented process cannot be held liable to the patentee, or in any extent to be an infringer. Similarity or even identity in appearance of a product is not sufficient, and the charge of infringement can only be sustained by certain proof that the defendant uses the process of the patent. Schwartz v. Housman (C. C.) 88 Fed. 519; Welsbach Light Co. v. Union Incandescent Light Co., 101 Fed. 131, 41 C. C. A. 255; Merrill v. Yeomans, 94 U. S. 568, 24 L. Ed. 235; National Phonograph Co. v. Lambert Co. (C. C.) 125 Fed. 388.

[4] The fifth and sixth claims are, in form, claims for products,

but for products as the result of a patented process. The process and the product must be regarded as inseparable and the process inheres in the product as it is made, as is held by the Supreme Court in Merrill v. Yeomans, supra. The process and the product are but one, and it may well be assumed that the product results from the use of the process described in the patent, and that the product is not one which may be produced in any other way. Plummer v. Sargent, 120 U. S. 442, 7 Sup. Ct. 640, 30 L. Ed. 737; Mosler Safe Co. v. Mosler, 127 U. S. 354, 361, 362, 8 Sup. Ct. 1148, 32 L. Ed. 182. A case directly in point is Downes v. Teter-Heany Development Co., 150 Fed. 122, 80 C. C. A. 76, decided by the Circuit Court of Appeals for the Third Circuit, in which it was distinctly held that where a patent includes claims for a process and also for the product of such process, the latter are to be construed in connection with, and are limited in scope by, the former, and are not infringed unless the process claims are also infringed.

Furthermore, with respect of claim 5, which requires the sound-record to be a "tablet" of wax or wax-like material and to have "a sound-groove cut or engraved therein, and to give reproductions sensibly equal in volume to the original sounds," the defendant has nothing to do with the manufacture of the records, or any records, or any steps used in the process of manufacturing its "pressed" records, which, according to the plaintiff's conjecture, are made by placing "pressing plates in a hydraulic press and bringing them down upon a mass of thermo-plastic material." Indeed, there is no evidence whatever to show that defendant's records, or any records comprised in the process of their manufacture, give reproductions "sensibly equal in volume to the original sounds" as required by claim 5.

That this is the proper view to take of these claims is confirmed by the correspondence between the applicant and the Patent Office, pending the granting of the patent, to which reference has already been made, particularly in the letter of February 25, 1899, canceling a prior claim, and in the applicant's letter of March 15, 1899, replying to the examiner's action of March 2, 1899, in which the examiner renewed his prior rejections on the ground that the expressions, such as "giving reproductions sensibly equal in volume to the original sounds," have been examined in detail in former actions, and are held not to express patentable distinctions. This letter of the applicant of March 15, 1899, replying to the examiner's letter of March 2, 1899, says distinctly that:

"This claim defines a means whereby a record made by applicant's inventions may be readily distinguished from all sound-records heretofore made, in that it defines the record as giving reproductions sensibly equal in volume to the original sounds."

This alleged ground of distinction which the applicant made, and which he is estopped from denying, if not a claim for a process, is a claim for a result, which is clearly unpatentable. O'Reilly v. Morse, 15 How. 61, 14 L. Ed. 601. So construed, none of the claims in controversy are infringed.

234 F.—24

The questions of patentability and prior use, broadly construed, have to do with the fact of high speed, the feature of the Bell & Tainter patent referred to in the specification, of the Edison British patent, No. 1644, of 1878, and of the talking-machines of commerce prior to Macdonald which had adjustable means for varying the speed of the tablets; they sometimes being run at high and sometimes at low speed. Whether what Macdonald did was the product of original conception, or a mere carrying forward or a more extended application of an original idea, or a mere improvement in degree, it is not necessary to consider, in the view which I have taken upon the defense of noninfringement, and which I am bound to and do sustain.

Decree accordingly.