**EMERY et al. v. G. C. MURPHY CO.**

No. 2195.

District Court, D. Connecticut.

Sept. 8, 1933.

576

Donald L. Brown, of New York City, for plaintiff.

John H. Hilliard, of New York City, for defendant.

THOMAS, District Judge.

The plaintiffs, James H. Emery, patentee of letters patent No. 1,390,349, dated September 13, 1921, and Louis Marchi, his exclusive licensee thereunder, have brought their bill in equity against G. C. Murphy Company, a Pennsylvania corporation, to restrain infringement of said patent and for an accounting. The patent comprehends an artificial grape, and method of producing the same. The bill, after alleging the issuance of the patent and. of the exclusive license to Marchi, further alleges that the defendant, having a regular and established place of business in Stamford, Conn., has infringed the patent within this state by making or causing to be made and selling or causing to be sold artificial grapes embodying the invention and/or produced by the method disclosed and claimed in the patent in suit.

Upon final hearing it appeared that the defendant did not itself manufacture the alleged infringing grapes, but merely sold one bunch to the plaintiff Emery at its said place of business in Stamford. These grapes were obtained by the defendant from an undisclosed source, and whether from a manufacturer or jobber does not appear.

Broadly speaking, the specification describes and claims an artificial grape comprising a core of thermoplastic material such as wax, a coating of the same material, a stem embedded in the core, and a coating of the grape with a light powder to increase the simulation of the genuine fruit. The patentee says in his patent:

"The principal object of the invention is to produce artificial grapes which in appearance are substantially identical to the natural fruit.

"A further object is to provide a simple, quick and economical method of producing such artificial fruit.

"In carrying out the invention a two part mold of one or more natural grapes is first provided in any suitable manner, * * * The mold is then filled with a suitable quantity of any convenient or desired temporarily fluid thermoplastic composition. When the filling composition has cooled sufficiently to become viscous, a stem of suitable material, such as wire, is inserted to a proper depth in the mold. As cooling continues, the composition solidifies, the stem becomes firmly embedded in the core, the mold is then separated and the core of the grape removed. Any bur or fin surrounding the stem is removed and the grape core is finished.

"The core is now dipped in a molten bath of suitable thermoplastic material and immediately removed, sufficient of the bath material adhering to the core completely to coat the same. The coating hardens almost immediately after the core is removed from the bath, and is then dusted with a suitable finely divided light colored powder, and the artificial grape is complete.

"* * * In producing imitations of grapes having a dark color, such as blue, it is immaterial whether the core is transparent or opaque, colored or colorless, since the outside coating 8 applied to the core will prevent the passage of light through the grape. When, however, grapes of a lighter color, such as light red or light green, are being imitated, it is important to use almost colorless and nearly transparent or at least translucent material in making the core. The remarkably close resemblance between the light colored artificial grapes produced in accordance with this invention and the natural articles results from the fact that the cores have substantially the same optical properties as the pulp of the natural grape, while the coating 8 has optical properties substantially identical to those of a natural grape skin.

"In order to prevent stem 9 from becoming detached from the core there is most desirably provided a bent or hook portion 10 which, when embedded in the core, securely anchors the stem in place. * * *

"In order to increase the resemblance between the artificial grape and the natural article and also to decrease the tendency of artificial grapes to adhere to one another in warm weather, it is desirable to dust the coating with some adhesive powder of light color. The most satisfactory material for this purpose has been found to be finely divided oxid of zinc.

"While the invention may be carried out with various thermoplastic materials, such as animal, vegetable or mineral waxes, it has been found that the best results are obtained in casting the cores when a mixture of about 10 parts of paraffin to 1 part of carnauba wax is used. The carnauba wax serves to raise the melting point of the mixture as well as to increase its hardness when in the solid state and the same mixture, with the addition of suitable coloring material, makes the best coating for the grapes."

Epitomized, plaintiffs claim that Emery first recognized the possibility of producing a wax grape closely simulating the real fruit by casting a translucent colorless waxen core and by dipping that core in translucent colored wax; that an artificial stem, made of wire, might be easily and effectively anchored in the grape, if a bent portion of the stem is inserted in the mold while the material therein is plastic. Defendant, on the other hand, asserts that the subject-matter of each of the claims is completely met in the patent application, that the patent is void for lack of invention, and does not disclose or claim any patentable variation or change from what was common knowledge in the art at the time of Emery's alleged invention. In support of its defense of lack of invention, defendant has submitted and referred to a number of printed articles which were admitted by stipulation of the parties to have been published more than two years prior to the date of Emery's application for the patent in suit. They will be examined briefly.

The Practical Magazine describes the process of manufacturing wax fruit as follows:

### "Wax Fruit and Root Making.

"Closely allied to wax-flower making is that of wax fruit, some specimens of which are marvellous for their faithful imitation of nature. Here moulding or casting is of more importance than in flower-making; seeing this accuracy of form is the chief desideratum. Most kinds of imitative fruit are shaped in double moulds, one for each half, and if the fruit is irregular in its curvatures a tripartite mould may be needed. Say that an orange is to be imitated in wax. A smooth, damp surface of sand is prepared, into which exactly one-half of a good orange is carefully pressed. A cordon or border of tin or stiff paper is built up around it, at about half an inch distance from the orange on all sides. Plaster of Paris, in a cream-like consistency, is poured into the cell thus made, so as to fully cover the orange. When quite firm enough to handle, this plaster half mould is taken up, and the orange extricated. The orange is then turned over in the sand, and another half-mould made in a similar way. Whether fruit are cast solid or hollow depends mainly on the size; if large, the mass would be heavy, and much wax wasted by solid casting; in this case a core of some rough material is fixed in the middle of the mould, which gives a cavity to the middle of the fruit. Soft kinds of fruit, such as plums, cherries, and ripe pears, and some hard and unyielding fruits, require special management to extricate them from the half-moulds without injury to the fruit on the one hand or to the moulds on the other. Pomegranates, medlars, pine apples etc., require moulds in more than two parts. Occasionally, elastic moulds of glue are found advantageous. Generally speaking, the colour of the wax employed is that of the lightest parts of the fruit, the deeper tints being afterwards laid on with brush or pencil. The chief pigments employed are such as burnt and raw umber and sienna, chrome yellow, red lead, Prussian blue, carmine lake, etc.; greens being produced by various admixtures of blue and yellow. Certain small varieties of fruit, such as grapes and currants, are made of glass bulbs, carefully blown to the proper shape; these are fixed by wax to wires inserted into holes, and are then dipped into melted wax of the proper colour, a very thin coating of which gives the proper kind of semi-transparency to the glass, and at the same time a smoothness of surface not inaptly resembling that of the natural fruit. The fastening of the various fruits to imitative stems, leaves, leaflets, etc., is an affair of wires, silken thread, strips of green paper, white flock, arrow-root paste, gum, mastic varnish, with the other simple materials and tools employed in artificial flower-making."

Godey's Lady's Book and Magazine, vol. 52, page 20, published in 1856, describes a similar process; first, casting the fruit in

wax, and, second, painting the casting to complete the simulation. I quote the following:

### "Waxen Fruit.

"The art of making Waxen Fruit includes every small object made in a mould; thus, the same instructions that direct to make an orange, are equally applicable to form an egg, a pea, a cucumber, the stem of a cactus, a doll, a bust, or any similar article, observing that the principle upon which all are formed is, that a mould is requisite. This is first to be made or procured, then wax is to be cast in it, sometimes solid, sometimes hollow. In many cases the objects will now be completely finished, with the exception of just trimming around where the mould joined; in other cases, the wax castings are to be painted with dry colors for some, and wet colors for others; and in different manners, according to the effect desired to be produced."

Godey's Lady's Book and Magazine, vol. 52 (erroneously stated in the stipulation as vol. 53), pages 325, 326, also published in 1856, describes in detail the operation necessary to cast and finish an orange and other waxen fruit. The author says, with respect to the formation of smaller fruit:

"The strawberry, raspberry, and cherry may be cast white, or some of them lake and white. The egg plum, and several of the pears and apples, may be yellow. The innumerable shades of green may be formed of different admixtures of chrome yellow and Prussian blue.

"* * * After the waxen fruit are cast, they require first to have the mark or ridge left by the joints of the mould carefully pared off with a penknife, and then generally the knife-marks smoothed off with a small piece of rag, dipped in turpentine or spirits of wine; very numerous fruits will after this simple operation be quite finished, as the orange, lemon, shaddock, walnut, and all other fruits which are of uniform color. The beauty, however, of most fruits lies not merely in their shape, but in a correct imitation of their bloom, rosiness, down, streaks, specks, and so on; and in imitating these properly, consists the only difficulty of waxen fruit making."

And on page 404 of the same volume, we read: "The fruit, if cast all at one time, should generally be cast of the lighter color, and the other color painted on afterwards, according to nature; thus of the half orange we should cast it yellow, and afterwards paint the pips (if visible) white, and the rind orange color, made chiefly of red lead."

The article goes on to describe a double casting process whereby the internal and external portion of the fruit may be cast separately in their proper colors. The last of the Godey publications states that some few fruits such as grapes and currants are not made in wax but are made with balls of glass, stalked, colored, and tied together. These glass balls are dipped in molten wax colored with Prussian blue or lake. The article says that the film of wax over the glass bulb will give to the grape "all the semi-transparency of the real fruit." In this connection the article in the Practical Magazine, supra, also speaks of forming grapes of glass balls. It says: "Certain small varieties of fruit, such as grapes and currants, are made of glass bulbs, carefully blown to the proper shape; these are fixed by wax to wires inserted into holes, and are dipped into melted wax of the proper colour, a very thin coating of which gives the proper kind of semi-transparency to the glass, and at the same time a smoothness of surface not inaptly resembling that of the natural fruit."

Another publication in evidence is Pomologia Artificiale Secondo II Sistema Garnier —Valletti, received in the United States Patent Office Library in 1894. The translation of this article describes a process of forming grapes (and currants) by entwining grape seeds about a thin brass wire which will eventually serve as the stem of the grape. The seeds and wire are then dipped in a melted paste composed of dammar resin and walnut oil and then in cold water. This dipping is continued until a ball is formed on the end of the wire about the size of the grape. The ball is then shaped with a sharp knife, after which the grape may be colored by successively dipping the grape in a colored paste of dammar resin and walnut oil and in cold water until a satisfactory color has been secured. The finished grape, the article says, is often covered with a crust of greenish dust to imitate the dust of the grape.

Still another prior publication is the Scientific American Supplement of April 20, 1918, which describes and illustrates pictorially wax modeling of flowers, fruits, and vegetables.

From a study of all the prior publications it is clear that at the time Emery entered into the field of wax molding there was little or no opportunity for the development of anything radically new. The art itself was of ancient origin, and had been practiced not only professionally and commercially, but as a pastime in the home. Speaking specifically and

in terms of Emery's specification, we find from these publications that the casting of various kinds of waxen fruit in molds was old; that it was old to color the fruit by penetrating the whole substance, by tinting the surface with paint, or by means of dipping. It was also old to obtain the proper colors to a fruit such as apples and oranges by double casting; it was old to use hooked wires embedded in the article as stems and to coat the surface of a finished grape with a fine powder to simulate the bloom on the natural grape. It was old to cast the core of the fruit white and to paint the surface in colors, and, generally, the various colors of the different fruits both inside and out were imitated wherever necessary or desirable to make perfect the imitation.

█ Claims 1, 2, 3, 4, 5, 6, 7, 10, 11, 12, and 13 are in issue and relied upon by the plaintiffs. Claim 3 is typical of the Emery disclosure. It reads: "3. An artificial grape comprising a core of colorless translucent wax and a coating of colored translucent wax covering said core."

Plaintiffs, in their brief, argue that Emery has demonstrated the possibility of making an artificial grape "truly representative of a natural grape by using a translucent colorless core and a translucent colored coating and that wax might be used for this purpose." Plaintiffs urge that, when fairly understood, it is obvious that Emery wished to avoid any dominant color in the core of the grape which would show through the translucent coating. From this it would appear that the plaintiffs rely for patentable novelty on the alleged translucent or semitransparent character of the colorless core and the colored covering of the artificial grape. The prior publications show that white wax, dammar resin, and glass, all of which are thermoplastic materials and translucent, had been used in the manufacture of simulated fruits of various kinds, both for the colorless core and the colored covering, achieving very effectively the result claimed by Emery.

Assuming that Emery did produce a simulation of a grape by using, in combination, a core of colorless translucent thermoplastic material such as wax, and a thermoplastic coating of colored material covering the same, did that contribution to the art constitute invention? It is not every advance, even though it be useful, that may be classified as inventive in character. Invention is defined in Walker on Patents (6th Ed.) § 59, as follows: "To be a patentable invention there must be present a creative mental conception as distinguished from the ordinary faculties of reasoning upon materials supplied by a special knowledge, and the facility of manipulation which results from its habitual and intelligent practice by those skilled in the art."

In Pyrene Mfg. Co. v. Boyce et al., 292 F. 480, at page 481, Judge Woolley, speaking for the Circuit Court of Appeals for the Third Circuit, after stating that it is a trite saying that invention defies definition, but through long use the word has acquired certain characteristics which at least give direction to its meaning, gives an admirable definition of the word. He says: "Invention is a concept; a thing evolved from the mind. It is not a revelation of something which exists and was unknown, but is the creation of something which did not exist before, possessing the elements of novelty and utility in kind and measure different from and greater than what the art might expect from its skilled workers."

Applying these definitions to the facts in evidence in this case, it is difficult to see how, with knowledge and in the light of the above-quoted prior art, it can be considered invention to have produced a grape having a colorless core of translucent thermoplastic material such as wax and a colored waxen covering therefor. I therefore conclude that claim 3 is invalid as not disclosing invention over the prior art. Claim 2 which is somewhat broader in scope is likewise invalid, and for the same reason. Claim 4 has an added element, to wit, a light colored powder adhering to the surface of the coating of the grape, and claims 6, 7, and 13 have as an element a projecting stem having a bent portion embedded within the core. These additions do not impart patentable novelty to the claims, since, as heretofore shown, stems of various kinds embedded in the core were common in wax fruit making, as was also the use of powder to dust the grapes. See in particular the Pomologia article, supra. Claims 1 and 12, not being limited to a translucent core, are broader than the invention and are definitely anticipated by the patent application cited. See particularly the Godey article, vol. 52, page 20. Claim 5 is invalid because it involves no invention in view of the patent application, as there is no evidence in the record that the use of oxid of zinc as a dusting powder possessed any novel function or is anything more than a mere substitution of material.

██ This leaves for consideration method claims 10 and 11 which purport to describe the process whereby the patented artificial

580

grape is produced. Defendant does not infringe these claims. It is a seller merely, and ordinarily a seller cannot be held an infringer. In American Graphophone Co. v. Gimbel Bros. (D. C.) 234 F. 361, 368 (affirmed (C. C. A.) 240 F. 971) this court said: "But a process patent is not infringed by selling the product, and the vendee of a product which has been made in infringement of a patented process cannot be held liable to the patentee, or in any extent to be an infringer. Similarity or even identity in appearance of a product is not sufficient, and the charge of infringement can only be sustained by certain proof that the defendant uses the process of the patent"—and cases cited.

■■ But plaintiffs say that this defendant should be held as a contributory infringer for aiding and abetting the manufacture of infringing grapes. One must in some manner, participate intentionally in some subsequent infringement of a patent, which occurs in accordance with his invention, to be classified and held as a contributory infringer thereof. Walker on Patents (6th Ed.) § 457. There is no evidence here that this defendant knew who manufactured Defendant's Exhibit 2. Furthermore, in answer to plaintiffs' interrogatories, defendant stated specifically that it has no knowledge as to the internal construction of any grapes sold by it, or the process of manufacture, or the materials of which they are composed. This is, therefore, not one of those instances of knowingly aiding and abetting infringement of a process patent of which General Electric Co. v. De Forest (C. C. A.) 28 F.(2d) 641, relied upon by the plaintiff, is an example. However, the successive steps defined in claims 10 and 11 are substantially disclosed in the prior art, and do not possess any element of novelty "different or greater than what the art might expect from its skilled workers."

■ Since the product is, in my opinion, destitute of patentable novelty, proof of commercial utility urged upon the court by plaintiffs in support of invention is irrelevant and unimportant. Duer v. Corbin Cabinet Lock Company, 149 U. S. 216, 13 S. Ct. 850, 37 L. Ed. 707. Commercial success is often an unsafe criterion, even of utility. To be of value in judging patentability, the success must be due to the merit of the article and attributable to the claims in suit.

I therefore conclude and find that the claims in suit are invalid for the reasons stated, and that claims 10 and 11 have not been infringed by defendant.

A decree may be entered for defendant dismissing the bill, with costs to abide the event.