22 C. C. P. A. (Customs)

### In re AMTORG TRADING CORPORATION.
#### Customs Appeal No. 3790.

Court of Customs and Patent Appeals.
Feb. 25, 1935.

Rehearing Denied April 8, 1935.

BLAND, Associate Judge, dissenting.

———◆———

Covington, Burling, Rublee, Acheson & Shorb, of Washington, D. C. (J. Harry Covington, John Marshall, Newell W. Ellison, and Alan C. Maxwell, all of Washington, D. C., of counsel), for appellant.

Carter, Ledyard & Milburn, of New York City (L. Randolph Mason, Henry D. Williams, and Wayne G. Jackson, all of New York City, of counsel), for appellees.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

GARRETT, Associate Judge.

This is an appeal from the findings and recommendations of the United States Tariff Commission in a proceeding had by that tribunal under the provisions of section 337 of the Tariff Act of 1930 (19 USCA § 1337).[1]

By the terms of the statute this court is limited to a consideration of "a question or questions of law only."

The material involved is apatite, a phosphatic mineral from which there is produced phosphoric acid used in the manufacture of fertilizer. The apatite of the issue was mined in Northern Russia, and the importation was from that country. Phosphoric acid is produced from both phosphate and apatite. In order to fit the minerals for use in producing acid, they must be separated, after being mined, from the unusable substances which surround them. The method of separation said now to be in general use in the United States is a process known as the flotation process.

It appears that a corporation by name of Minerals Separation North American Corporation (not a party to this proceeding) is the owner of certain United States patents defining flotation processes. Among these are patent No. 1,547,732, issued July 28, 1925, to Walter Broadbridge and Edwin Edser, assignors, entitled "Production of Fertilizer Material," and patent No. 1,795,-100, issued March 3, 1931, to William Trotter and Eltoft Wray Wilkinson, assignors, entitled "Flotation Concentration of Phosphate-Bearing Material." For brevity, these will be hereinafter referred to, respectively, as the Broadbridge patent and the Trotter patent.

It is conceded that the patentees have no patents from the Union of Soviet Socialist Republics (hereinafter referred to as Russia) or any preceding Russian government.

---

[1] For the full text of the pertinent portions of the section, see footnote in the case of In re Orion Co., 71 F.(2d) 458, 460, 22 C. C. P. A. (Customs) ——, T. D. 47123.

It further appears that a corporation known as Phosphate Recovery Corporation holds an exclusive license under the involved patents; that another corporation, American Cyanamid Company, is a nonexclusive sublicensee, and that still another corporation, International Agricultural Corporation, while not a licensee or sublicensee, has contracts under which Phosphate Recovery Corporation concentrates phosphates for it by the involved patented processes.

The instant proceedings were initiated before the Tariff Commission by the three last-named corporations, hereinafter referred to as appellees, a joint complaint being filed by them which alleged unfair methods of competition and unfair acts in the importation and sale in the United States of apatite, or phosphate rock, imported from Russia.

In view of the manner in which the issues to be reviewed by this court are limited in the appeal, and particularly in the argument before us, it is not deemed essential or proper to set forth with any degree of particularity all the allegations and responses thereto contained in the several pleadings, as finally amended, which were passed upon by the Tariff Commission, nor is a full statement of all the Commission's findings upon all phases of the controversy necessary.

It seems sufficient, for the purposes of our consideration, to state that a corporation known as Standard Wholesale Phosphate and Acid Works, Inc., of Baltimore, Md., was alleged to have purchased from "United Chemical Industries" of Russia some 25,000 tons of phosphate rock, of which some 7,000 tons were alleged to be en route to the port of Baltimore, and that the said United Chemical Industries, to quote from the complaint, "separate all phosphate mined by them from the mate-

rial with which it is found in the earth by means of a Phosphate Flotation Process, *which process is covered by United States patents 1,547,732, 1,795,100 and 1,780,022, and such separation of phosphate by the said United Chemical Industries* * * * *utilizes the invention described and claimed in said patents,* * * * *and that such acts constitute unfair methods of competition and unfair acts in the importation of articles into the United States and their sale by the owner, importer, consignee and their agents.*" (Italics ours.)

The italicized quotation comprehends what we regard as the principal issue with which this court need concern itself.

The appellant here, Amtorg Trading Corporation (hereinafter referred to as Amtorg), seems to have been made a party to the proceedings before the Tariff Commission because of the fact that it was the actual vendor of the imported material to Standard Wholesale Phosphate & Acid Works; Amtorg having purchased it from the Russian organization. Amtorg[2] is a corporation organized under the laws of the state of New York, and in its answer to the complaint in this case states, inter alia: "Amtorg is now engaged, and since its organization in 1924, has been engaged in the purchase of commodities in the United States for shipment to the Union of Soviet Socialist Republics (hereinafter called Soviet Union), and in the purchase of commodities in the Soviet Union for importation into and sale in the United States."

The Tariff Commission found as a fact that the flotation processes used in Russia for separating the apatite involved from the unusable substances surrounding it were the same as the processes respectively involved in the patent to Broadbridge and in claims 2 and 11 of the Trotter patent.

The authority cited by the Commission[3] for its finding here under review is its own

---

[2] For a somewhat detailed discussion of the character and legal status of Amtorg, by this court, see Amtorg Trading Corp. v. United States, 71 F.(2d) 524, 21 C. C. P. A. (Customs) 532, T. D. 46975.

[3] To the end that the Commission's viewpoint may be stated in its own words, we quote the following from its decision:

"Respondents [Amtorg] contend that the importation and sale of articles made in accordance with the process claims in question do not constitute infringement of the patents and are therefore not unfair competition. As was said in part in the report to the President on Bakelite (pp. 11 and

12), the Commission recognizes the line of authority represented by American Graphophone Co. v. Gimbel Bros. (D. C.) 234 F. 361, 368, and cases therein cited, to the effect that the vendor of a product made according to a patent process is not liable to the patentee as an infringer and that in such cases the remedy is against the manufacturer. But it should be borne in mind that in the case of manufacture in the United States the patentee has a remedy; he can proceed against the domestic manufacturer, thereby stopping the evil at its source. But in the case of manufacture abroad of articles the method for

prior finding in a proceeding with reference to the importation of bakelite, which finding was approved by the majority of this court in the case of Frischer & Co., Inc., et al., v. Bakelite Corporation et al., 39 F.(2d) 247, 17 C. C. P. A. (Customs) 494, T. D. 43964, certiorari to review this court's decision having been denied by the Supreme Court of the United States in the case of Frischer & Co., Inc., et al., v. Bakelite Commission et al., 282 U. S. 852, 51 S. Ct. 29, 75 L. Ed. 755.

It is pertinent, at this point, to recite that subsequent to the promulgation of the Commission's statement, findings, and recommendations in the instant case, which promulgation was of date January 15, 1934, this court has had occasion to pass upon kindred questions in two cases also appealed from that tribunal. These are In re Orion Co., 71 F.(2d) 458, 22 C. C. P. A. (Customs) ——, T. D. 47123, and In re Northern Pigment Co. et al., 71 F.(2d) 447, 22 C. C. P. A. (Customs) ——, T. D. 47124. These decisions along with the Frischer & Co. Case, supra, will be hereinafter more fully-discussed.

It is not admitted by appellant in the instant case that the processes used in the operations in Russia are, in fact, the processes of the respective patentees as found by the Tariff Commission, but it is conceded that, since this is purely a question of fact upon which the Commission has made a finding based upon substantial, even if controverted, evidence, that issue is not one which this court may now consider. Such concession is in harmony with this court's holdings in the several cases above cited.

The entire argument on behalf of appellant respecting what we have above stated the principal issue to be, is predicated upon the fact that the patents which are involved are *process*, not *product*, patents. It is pointed out that in the Frischer & Co. et al. and Orion Co. Cases, supra, such patent questions as were actually controlling related solely to *product* patents, and, so far as the instant case is concerned, it is not urged that the decisions in those cases, in so far as they related to *product* patents, be overruled. Reconsideration by this court of the principles announced in those cases is here asked only to the extent that any observations there made may have a bearing upon *process* patents.

---

producing which is patented only in the United States, domestic patentees cannot reach foreign manufacturers through the process of the Federal courts. If the contention of respondents should be adopted, domestic patentees would be remediless. To say that domestic manufacturers may protect rights acquired under patents against other domestic manufacturers and vendors but not against foreign manufacturers and importers is repugnant both to law and reason. Section 337 [19 USCA § 1337] denounces as unlawful all unfair methods of competition or unfair acts which have the tendency to substantially injure or destroy an industry in the United States. If the provisions of that section be not invoked and applied, the injury to or destruction of American industries built up under patent protection and safeguarded from unfair domestic competition may be effected through importations. The Commission feels that section 337 was intended to prevent such results.

"The law clearly gives to American producers the right to fair competition in the sale of their goods. Patentees or their licensees are entitled to such competition in the markets of the United States. Any method or act which unfairly interferes therewith comes within the terms of the statute in respect of imported products. Existence of the unfair method or act is predicated upon importation or sale in the United States; the remedy prescribed by the statute is specifically against the imported merchandise and not against the manufacturer or vendor. The value of a process patent would be seriously impaired if articles manufactured abroad in accordance with the process could be imported and sold in the United States without contravening section 337.

"In enacting section 316 of the Tariff Act of 1922 [19 USCA §§ 174–180] and section 337 of the Tariff Act of 1930 the Congress did in effect (where the requirements of the section are met) what, as stated in respondents' brief at page 97 et seq., was not done by amendment to the patent laws. As a result of that legislation, domestic patentees have a remedy, not by injunction or by damages under the patent laws, but by exclusion from entry of imported products made in accordance with United States process patents.

"The Commission reaffirms the finding made in the Bakelite investigation that the importation into the United States of articles produced abroad in accordance with a process described in a United States patent without the sale thereof by the owner, importer, consignee, or agent of either, is an unfair method of competition or unfair act within the meaning and intent of section 337."

With respect to the Northern Pigment Co. Case, however, the situation is different. In that case one of the patents involved was a purely process patent; the other patent contained both process and product claims. We there sustained the holdings of the Tariff Commission to the effect that the importation into the United States from Canada of pigments manufactured by a process, or by processes, patented in the United States, but for which patentees held no Canadian patents, and the sale of same here, brought the transaction within the purview of section 337 of the Tariff Act of 1930 (19 USCA § 1337), and justified the issuance by the President of the United States of the order of embargo.

It is not possible to draw any distinction, in principle, between the process claims involved in the Northern Pigment Co. Case, supra, and the case at bar, and, if the doctrine there applied with respect to process claims be adhered to, it is controlling here. This is recognized by appellant, and so we are asked to reconsider the question in the light of numerous authorities and arguments based thereon which were not presented at the hearing of the former issue.

We deem it our duty, under the presentation here made, to give full and careful re-examination of said question. The courts upon whom, in a peculiar sense, there must be final reliance for the establishment and maintenance of correct legal principles, do not, and should not, hesitate, when convinced that they have fallen into error, to reverse their own decisions and announce the principles which fuller information and more mature consideration lead them to conclude are sound and correct.

In Barden v. Northern Pacific Railroad Co., 154 U. S. 288, 322, 14 S. Ct. 1030, 1036, 38 L. Ed. 992, Mr. Justice Field, speaking for the court, after discussing certain cases in which he had written the opinions, some expressions of which were urged to be in conflict with the views being expressed in the case then being decided, said: " * * * It is more important that the court should be right upon later and more elaborate consideration of the cases than consistent with previous declarations. Those doctrines only will eventually stand which bear the strictest examination, and the test of experience."

The contentions in behalf of appellant upon the particular phase of the controversy now under discussion are, in effect, that section 337 of the Tariff Act of 1930, 19 USCA § 1337 (which is, in substance, the same as section 316 of the Tariff Act of 1922 (19 USCA §§ 174–180), under which the Frischer & Co. Case, supra, arose), is *solely remedial;* that it has in nowise enlarged the substantive grant of rights under the patent laws; that there was no infringement of the patents by the use of the process in Russia; and that the section does not clothe the President of the United States or the Tariff Commission, when acting thereunder, with any authority arbitrarily to declare an act, which does not fall within the category described by "Unfair methods of competition and unfair acts in the importation of articles into the United States" as such acts are *judicially* determinable by the courts, under settled rules of law, to be such an act as authorizes the issuance of the order of embargo provided by the section.

The brief on behalf of appellant quotes from the opinion of the Supreme Court of the United States in the case of Federal Trade Commission v. Gratz et al., 253 U. S. 421, 427, 40 S. Ct. 572, 575, 64 L. Ed. 993, as follows: "The words 'unfair method of competition' are not defined by the statute and their exact meaning is in dispute. It is for the courts, not the commission, ultimately to determine *as matter of law* what they include. They are clearly inapplicable to practices never heretofore regarded as opposed to good morals because characterized by deception, bad faith, fraud, or oppression, or as against public policy because of their dangerous tendency unduly to hinder competition or create monopoly. The act was certainly not intended to fetter free and fair competition as commonly understood and practiced by honorable opponents in trade." (Italics ours.)

As we construe the foregoing quoted language, while it is for the courts ultimately to determine, as a matter of law, what the words "unfair method of competition" include, it was within the jurisdiction of the Federal Trade Commission initially to pass upon whether a particular method of competition was, as a matter of law, unfair; that it is not necessary that a particular act, or method, or practice must have been declared by the courts to be unfair before the Commission could properly find such act, method, or practice to be unfair, but, to be unfair, it must fall within the general domain of practices "heretofore regarded as opposed to good morals because character-

ized by deception, bad faith, fraud, or oppression, or as against public policy because of their dangerous tendency unduly to hinder competition or create monopoly." This language is broad and comprehensive. It covers a large field, as do the words "due process of law," "unjust discrimination," and the like. The words "unfair method of competition" may include acts which have never been specifically declared by the courts to be unfair. Federal Trade Commission v. Keppel & Bro., 291 U. S. 304, 54 S. Ct. 423, 426, 78 L. Ed. 814; Federal Trade Commission v. Raladam Co., 283 U. S. 643, 51 S. Ct. 587, 75 L. Ed. 1324, 79 A. L. R. 1191; Sears, Roebuck & Co. v. Federal Trade Commission (C. C. A.) 258 F. 307, 6 A. L. R. 358.

In each of the above-cited cases, however, the methods of practices found to be unfair fell within the general domain of unfair practices suggested in the Gratz Case, supra. In the case of Federal Trade Commission v. Keppel & Bro., supra, it was said of the practice there declared to be unfair: " * * * It is clear that the practice is of the sort which the common law and criminal statutes have long deemed contrary to public policy."

In the case of Federal Trade Commission v. Raladam Co., supra, the Commission was reversed in its holding that certain acts there involved were "unfair methods of competition."

In the case of Sears, Roebuck & Co. v. Federal Trade Commission, supra, a certain misrepresentation in advertising was held to be an unfair method of competition, but it was also held that the selling of certain merchandise by appellant below cost was not an unfair method of competition, unless accompanied by misrepresentation in connection with such sale.

No case has been brought to our attention, nor have we found any, holding that the Federal Trade Commission may legally declare an act or method of practice unfair which the courts have judicially determined not to be an unfair act, or method, or practice, nor have we found any case holding any act, method, or practice to be unfair that did not come within the general domain of unfair methods of competition suggested in the hereinbefore quoted language from the Gratz Case, supra.

To state our interpretation of appellant's position upon this question, it is that the acts of the President and of the Tariff Commission authorized by section 337, supra, are purely administrative, and that the acts upon which an embargo order may be predicated are only such acts as are unfair within the judicial meaning of the terms used in the statute. It is then urged that the use in Russia of the processes of the United States patents involved was entirely lawful, and that in the act of importation itself there was no element or incident of unfairness; the importation being made openly and in entire accordance with the laws appertaining to such transactions.

It is but fair to this court to say that in no one of the three cases above named, in which we have been called upon to pass upon recommendations of the Tariff Commission, has the construction of the statute here advanced been presented as it is now presented, nor have we been supplied by prior litigants with the authorities which appellant has caused to be presented here. Such we think will be evident from a reading of both the majority and minority opinions in those cases.

Upon the consideration given the issue under the presentation here made, we feel constrained to hold that the theory now advanced is sound, and that it correctly sets forth the true meaning of the section, and under that theory we proceed to an examination of the question whether *as a matter of law* the acts found by the Tariff Commission to have been performed, such findings being findings of fact and binding upon us, were acts which authorize the exclusion of the merchandise, as the Commission recommends.

The facts are quite simple. Merchandise not itself patented, manufactured in Russia by a process patented in the United States, but not in Russia, was imported into, and entered the commerce of, the United States.

The owner of a valid United States patent is protected in its exclusive use "throughout the United States, and the Territories thereof." 35 USCA § 40.

It follows, therefore, that the courts will protect the owner of a United States patent against an infringement thereof anywhere in the United States and its territories, where suit is brought in the proper jurisdiction. But the protection which the laws of the United States afford is limited to the territory named in the statute. In the case of Dowagiac Manufacturing Company v. Minnesota Moline Plow Company, 235 U. S. 641, 35 S. Ct. 221, 225, 59 L. Ed. 398, the Supreme Court said: " * * * The

right conferred by a patent under our law is confined to the United States and its territories * * * and infringement of this right cannot be predicated of acts wholly done in a foreign country."

Other pertinent cases are Bullock Electric & Mfg. Co. v. Westinghouse Electric & Mfg. Co. (C. C. A.) 129 F. 105; Victor Talking Mach. Co. v. Strauss (C. C.) 171 F. 673; Rushmore v. Manhattan Screw & Stamping Works (C. C.) 170 F. 188; Brown v. Duchesne, 60 U. S. (19 How.) 183, 15 L. Ed. 595.

■ It is also true that the owner of a patent granted by a foreign country, but having no United States patent, is not protected in the United States under our laws by his foreign letters patent.

■ The distinction between product and process patents is clear and is quite generally understood. The product patent is upon an invented or discovered article; the process patent is upon a method of making an article. It not infrequently happens that in the same letters patent invention is recognized in both the article and the method of making it, but it is the well-settled rule of law that a product patent protects only the product, and that a process patent protects only the process.

In Holland Furniture Company v. Perkins Glue Company, 277 U. S. 245, 255, 48 S. Ct. 474, 478, 72 L. Ed. 868, the Supreme Court said: " * * * A patentable process is a method of treatment of certain materials to produce a particular result or product. Cochrane v. Deener, 94 U. S. 780, 24 L. Ed. 139. The description of one does not necessarily embrace the other. Either or both may be patentable. * * * "

■ Thus a process patent is not infringed by the sale of a product made by the process, the product itself not being patented, and a product patent is not infringed by one who uses the process by which it is made, the process itself not being patented. Additional authorities will be cited later.

■ In the case at bar, the apatite (the article) is not patented. Hence there is no infringement of the patented process by a sale of apatite. The Russian exporter had a perfect right to sell and the American importer had a perfect right to buy the apatite and to resell it in the United States, in so far as any question of a process patent is concerned. Had there been a product patent we should, of course, have here a case analogous to the material parts of the Frischer and Orion Cases, supra.

As has been already indicated, the use of the process in Russia was entirely legitimate, since the patentees held no Russian patents. Were the situation reversed, that is to say, if patentees held Russian patents but not United States patents for the process only, such patentees would have no exclusive right to use same in the United States which could be protected by the courts under the laws of the United States.

The brief filed on behalf of appellant contains certain quite interesting legislative history with respect to a proposal made in 1852 by a bill introduced in the United States Senate at a session of the Thirty-Second Congress. By the terms of said bill it was proposed to make illegal the importation into the United States of a product of a patented process, or a product of a patented machine, provided the defendant had knowledge and the manufacture was in a nearby or adjoining country. The bill was discussed by various Senators, and seems to have been introduced in subsequent Congresses, but was never enacted into law. Citations are made to Congressional Globe, 32 Cong. 1st. Sess. pp. 1549–1551, 1566–1573, and 2d Sess. pp. 127, 128, 528, 534–536. House 2d Sess. 540.

No legislation of the nature of that proposed in 1852 has ever been enacted by the Congress and the extent of patent rights granted by process patents, which extent depends upon the statutes, has not been substantially changed by any law specifically directed thereto since such was fixed by Act of April 10, 1790, § 1 (1 Stat. 109); see, also, Act of July 4, 1836, § 5 (5 Stat. 117, 118, 119); Act July 8, 1870, § 22 (16 Stat. 198, 201, Rev. St. § 4884) amended by Act May 23, 1930 (46 Stat. 376, 35 USCA § 40).

Since the Commission's recommendation in the instant case rests solely upon its finding that the act of importing apatite, made by the processes defined in the United States patents, constituted the act denounced by the statute, it becomes of importance to examine the decisions of the courts with respect to the extent of the protection afforded by process patents. These decisions uniformly have been to the effect that a patent for a process is not infringed by selling the product. Merrill v. Yeomans, 94 U. S. 568, 24 L. Ed. 235; Welsbach Light Co. v. Union Incandescent Light Co. (C. C. A.) 101 F. 131; National Phonograph

Co. v. Lambert Co. (C. C.) 125 F. 388; American Graphophone Co. v. Gimbel Brothers (D. C.) 234 F. 361; Kryiak v. Owens Bottle Co. (D. C.) 25 F.(2d) 358; Barton v. Nevada Consolidated Copper Co. (D. C.) 36 F.(2d) 85, 86. No authority holding otherwise has been cited in the several briefs filed in this case, nor have we found any as a result of our own researches.

The two. latter cases above cited are further of importance here because of their holding upon the question of jurisdiction in .respect to the protection of process patents.

By the provisions of the Judicial Code § 48, 28 USCA § 109, suits brought for the infringement of patents are required to be brought in either the judicial district of which the defendant is an inhabitant, or in any district in which the defendant has committed an act of infringement.

In the Kryiak Case, supra, the defendant, Owens Bottle Company, was a corporation of the state of Ohio. It established a sales office in the state of Illinois, and there sold certain unpatented bottles alleged to have been made by a process for which plaintiff, Kryiak, held a patent. The manufacture of such bottles, however, did not take place in the judicial district of Illinois where the suit was brought, but in other states. Suit was brought by plaintiff in the district of Illinois where the sales were made, alleging infringement of the two claims of his patent, both being *process* claims. The court, holding that the sale of the product did not infringe the process patent, dismissed the bill for "want of jurisdiction." A similar principle was applied in the Barton Case, supra, where a. citizen of California brought suit. in the Southern District of New York against a Maine corporation alleging infringement of a process patent. It being found that the manufacturing process was not carried on in the New York district, only sales of the unpatented product being made there, the court dismissed the case, saying: " * * * This district is not the proper venue for this suit."

In both the foregoing cases it seems to have been conceded that the defendants were, in fact, manufacturing the unpatented articles by the respective patented processes, but not in the districts where sued. There only sales of the unpatented products had taken place, and, upon the established doctrine that a process patent is not infringed by the sale of its resultant. unpatented product, it was held, in effect, that there had been no infringement in the districts where the suits were instituted.

The brief for appellant cites the case of Hurn v. Oursler, 289 U. S. 238, 53 S. Ct. 586, 590, 77 L. Ed. 1148, with comment to the effect that it is believed that the decision of the Supreme Court therein conclusively disposes of the question now under discussion here.

In that case suit was brought, the allegation, in so far as here material, being (1) the infringement of copyright, and (2) unfair competition, based upon a claim that a certain play called "The Evil Hour," belonging to and copyrighted by petitioners, had been pirated by defendant. Both plaintiff and defendant were citizens of the same state.

It was pointed out by the Supreme Court that both the infringement claim and the claim of unfair competition rested upon the alleged violation of a single right, to wit, the right of protection to the copyrighted play. The court said, inter alia:

" * * * The bill alleges the violation of a single right; namely, the right to protection of the copyrighted play. And it is this violation which constitutes the cause of action. Indeed, the claims of infringement and unfair competition so precisely rest upon identical facts as to be little more than the equivalent of different epithets to characterize the same group of circumstances. The primary relief sought is an injunction to put an end to an essentially single wrong, however differently characterized, not to enjoin distinct wrongs constituting the basis for independent causes of action. The applicable rule is stated, and authorities cited, in Baltimore S. S. Co. v. Phillips, 274 U. S. 316, 47 S. Ct. 600, 71 L. Ed. 1069. 'A cause of action does not consist of facts,' this court there said (page 321 of 274 U. S., 47 S. Ct. 600, 602), 'but of the unlawful violation of a right which the facts show. The number and variety of the facts alleged do not establish more than one cause of action so long as their result, whether they be considered severally or in combination, is the violation of but one right by a single legal wrong. * * * "The facts are merely the means, and not the end. They do not constitute the cause of action, but they show its existence by making the wrong appear." '

"Thus tested, the claims of infringement and of unfair competition averred in the

present bill of complaint are not separate causes of action, but different grounds asserted in support of the same cause of action."

The court accordingly held that since federal jurisdiction existed by reason of the copyright being involved, there was also federal jurisdiction of the question of unfair competition, in so far as use of the copyrighted play was concerned, although the parties were citizens of the same state, and it was further held that since the District Court was correct in its finding upon the merits that there had been no infringement of the copyright, this also disposed of the interrelated question of unfair competition in so far as the same related to the *copyrighted* play.

The analogy between the phase of the Hurn Case, supra, which has been recited, and the particular phase of the instant case, now under discussion, in so far as the principle applicable is concerned, seems quite complete. In the Hurn Case, supra, the rights of the parties rested solely upon the copyright statutes; in the instant case the rights of the parties rest solely upon the patent statutes. Incidentally it may be remarked that the statutes themselves rest upon the same paragraph of the Constitution of the United States.

We are unable to see wherein, if the question of unfair competition fell with the finding that there had been no infringement of the copyright laws in the Hurn Case, supra, it must not also be held that "unfair methods of competition and unfair acts in the importation" of the merchandise here involved fall when it is determined, as it must be, that there was no infringement of the patented processes, since, under the facts found, the alleged unfair methods and acts related solely to the use of such processes.

Such must be the holding unless the court finds that it was the purpose of the Congress in enacting section 337 of the Tariff Act of 1930 (19 USCA § 1337) to broaden the field of substantive patent rights, and create rights in process patents extending far beyond any point to which the courts have heretofore gone in construing the patent statutes.

Mature consideration of the question leads us to the conclusion that Congress did not do this. Hence, we conclude that our decision in the Northern Pigment Co. Case, supra, went further than the statute provides, and that, in so far as said decision

involved process claims, it was erroneous. We also withdraw any expressions of adjudication relating to process patents appearing in the Frischer and Orion Co. Cases, supra.

However, nothing herein contained should be construed as revoking or modifying, in any respect, the decisions rendered with reference to product patents in the Frischer and Orion Co. Cases, supra. The distinction between product and process patents and the remedies afforded by the law for their protection against infringement are so well defined and so well known that it is deemed unnecessary to here enter upon any discussion with respect thereto.

■ If some of the suggestions which have been offered during consideration of this case were carried to their logical conclusion, it would seem to follow that the importation of any merchandise the cost of which to the importer was lower than the price he would have to pay for a similar or competitive article produced in the United States would constitute an unfair method of competition within the purview of section 337, supra. Such a transaction might be regarded as unfair by an interested party, but obviously Congress never intended that such should fall within the operation of the section.

In reaching the conclusion here announced, we have given due attention to the authorities cited by appellees in the several briefs filed, and to the legislative history to which they directed attention.

A part of this history was recited by us in the Orion Co. Case, supra, as follows:

"When section 316 was being incorporated into the Tariff Act of 1922 (19 USCA §§ 174–180), the Senate Finance Committee, in reporting the bill to the Senate, incorporated this illuminating language as to the purposes of the embargo provision of that section:

'"The provision relating to unfair methods of competition in the importation of goods is broad enough to prevent every type and form of unfair practice and is, therefore, a more adequate protection to American industry than any anti-dumping statute the country has ever had. (Senate Report No. 595, p. 3, 67th Cong. 2nd Session.)'

"At the time H. R. 2667 was being considered, the United States Tariff Commission called the attention of the Ways and Means Committee to the difficulties had in

the administration of sections 315, 316, and 317 of the Tariff Act of 1922, and made this suggestion:

" 'Importance of Commission's Jurisdiction of Patent Infringements

" 'Existing law, apart from section 316, is wholly inadequate to protect domestic owners of patents from violation of their patent rights through the importation and sale of infringing articles. Such infringing articles may be and are imported in large quantities and distributed throughout the United States. The owner of a patent, seeking to protect himself, is confronted with the necessity of proceeding against individual wholesalers or retailers. The resulting multiplicity of suits imposes an impossible burden. Stoppage of importation of infringing articles through an order of exclusion from entry is the only effectual remedy. The jurisdiction of district courts and the scope of any decree issued by them do not extend to the importation or exclusion of imported merchandise from entry into the United States. Section 316, therefore, as construed by the Tariff Commission in its findings now before the Court of Customs Appeals for review, affords an exclusive remedy. (Vol. 17, Supp. to Tariff Readjustment Reports on Tariff Bill of 1929, page 10667.)'

"Thereafter, the committee reported to the House, in part, as follows:

" 'The only change made by the section over existing law is the elimination of the provision which authorized the President to impose such additional duties not in excess of 50 per cent or less than 10 per cent of the value of the article imported in violation of the section as would offset the unfair method or act employed. The committee feels that this provision should not be retained for the reason that the imposition of penalty duties to offset violations is entirely inadequate to prevent further violations. The effective remedy is to exclude from entry the articles concerned in the violation. (Report, Ways and Means Com. on H. R. 2667, Rept. No. 7, 71st Congress, 1st. Session, p. 166.)' "

Our comment preceding the above recital was as follows: "It will be borne in mind that many of the decisions cited in the Frischer Case, supra, and here, were rendered under statutes intended to prevent unfair methods of competition in the internal commerce of the country. Much more reason appears for the prevention of such practices in the case of importations from foreign countries. In this latter class of cases, manufactured products, produced in a foreign country where the producer is beyond the control of the courts of the United States, are imported into this country. Up until the time when they are released from customs custody into the commerce of this country, no opportunity is presented to the manufacturer of the United States to protect himself against unfair methods of competition or unfair acts. After the goods have been so released into the commerce of the country, the American manufacturer may assert his rights against any one who has possession of, or sells, the goods. However, this method of control must be, and is, ineffective, because of the multiplicity of suits which must necessarily be instituted to enforce the rights of the domestic manufacturer. This phase of the matter obviously was in the minds of the Congress at the time of the preparation of said section 337."

It is our view that the foregoing supports the conclusion here reached as to process patents.

There are other contentions on behalf of appellant, but, in view of our conclusion upon the issue already discussed, it is deemed unnecessary to pass upon them. We would, however, observe that it appears obvious that, even under the Commission's theory, the recommendation based upon the Trotter patent should have been confined to only claims 2 and 11 thereof, these being the only claims of this patent, the process of which was found to have been used in Russia.

The finding of the United States Tariff Commission that, upon the facts found by it, the importation of the apatite involved constituted unfair methods of competition and unfair acts in the importation of the articles within the purview of section 337 of the Tariff Act of 1930 (19 USCA § 1337) is reversed.

Reversed.

BLAND, Associate Judge (dissenting).

I must respectfully dissent from the conclusion reached and the reasoning employed by my associates. The case is of such vast importance, in respects which I will later point out, that I feel compelled to explain, at some length, why I think the decision is wholly unsound.

Section 337 (a), Tariff Act of 1930 (19 USCA § 1337 (a), reads:

"Sec. 337. Unfair practices in import trade.

"(a) Unfair methods of competition declared unlawful. Unfair methods of competition and unfair acts in the importation of articles into the United States, or in their sale by the owner, importer, consignee, or agent of either, the effect or tendency of which is to destroy or substantially injure an industry, efficiently and economically operated, in the United States, or to prevent the establishment of such an industry, or to restrain or monopolize trade and commerce in the United States, are hereby declared unlawful, and when found by the President to exist shall be dealt with, in addition to any other provisions of law, as hereinafter provided."

I wish first to state, as briefly as possible, my understanding of what the majority opinion holds, and the expressed reasons which prompt such a holding.

There are a number of things in the opinion which need not have been recited or emphasized, but in its present form it does reaffirm the correctness of this court's conclusion in Frischer & Co., Inc., et al., v. Bakelite Corporation et al., 39 F.(2d) 247, 267, 17 C. C. P. A. (Customs) 494, T. D. 43964; In re Orion Co., 71 F.(2d) 458, 22 C. C. P. A. (Customs) ——, T. D. 47123; and In re Northern Pigment Co. et al., 71 F.(2d) 447, 22 C. C. P. A. (Customs) ——, T. D. 47124, in so far as those cases held or suggested that the importation into this country of a patented article, regardless of the intent of the importer, or the motives or lack of motives that prompted the importation, constituted unfair methods of competition and unfair acts in importation, but that anything said in any of this court's decisions which related to the importation of an article lawfully manufactured in a foreign country by the process of an American patent, which process patent could be protected here, was withdrawn from such decisions. It also holds, either expressly or by inference, that the importation of an article lawfully made abroad upon an American patented machine had the same status as the product of a process patent.

It will be noticed that in section 337 (a), supra, there are two things declared unlawful: (1) Unfair methods of competition and unfair acts in the importation of articles; (2) or "in their sale by the owner, importer, consignee, or agent of either, the effect or tendency of which is to destroy

or substantially injure an industry, etc." In the case at bar, the unfair act in importation, as well as the sale in this country of the article so imported, is involved.

The majority opinion in its present form does not accept many of the contentions made by the appellant and properly so, since it was not necessary to hold with appellant on these contentions in order to arrive at the conclusion reached by the majority. Now, if I understand the real basis of decision in the majority opinion, it is that there was no unfair method of competition or unfair act in the importation or sale of the apatite involved, shown by the record at bar, for the reason that the unfair competition and unfair act complained of does not "fall within the general domain of practices heretofore regarded as opposed to good morals because characterized by deception, bad faith, fraud or oppression, or as against public policy because of their dangerous tendency unduly to hinder competition or create monopoly.'" The majority opinion states: "* * * It is then urged that the use in Russia of the processes of the United States patents involved was entirely lawful, and that in the act of importation itself there was no element or incident of unfairness, the importation being made openly and in entire accordance with the laws appertaining to such transactions."

The majority then holds that "the theory now advanced [by the appellant] is sound. * * *"

It seems clear to me that the mere fact that the importation at bar was made in accordance with law (leaving section 337 (a), supra, out of consideration), and was made openly, is no justification for holding that such importation did not constitute an unfair act. The majority holds that the importation of a patented article, although lawful (again leaving section 337 (a) out of consideration) and open, is an unfair act. Leaving the statute at bar out of consideration, it was lawful to import such an article although its sale in this country might be stopped in an infringement suit.

It seems to me to be far-fetched to hold that, because the sale of a product of a process cannot be held to be an infringement, it necessarily follows that it might not constitute an unfair method of competition (in importation) or an unfair act in the importation of an article. The holding of the majority is so broad and far reaching that, in my judgment, it will bring about

the complete nullification of the much needed legislation involved. It must be remembered that other obviously unfair acts in *importation,* not relating to patents, aimed at by the provision, will also necessarily fall under the rule which is laid down by the majority.

Congress was not content to use the same expression it used in the Federal Trade Commission Act (38 Stat. 717 et seq., title 15, § 41 et seq. U. S. C., 15 USCA § 41 et seq.), "unfair methods of competition." It sought also to reach acts which by strict interpretation did not fall within that phrase, and it used the term "unfair methods of competition [in the importation] and unfair acts in the importation of articles." Neither term was ever used before in any legislative enactment, and neither term has ever been defined by any court except this one. It is unthinkable that Congress intended to do what the majority says, in effect, it intended to do. It surely did not intend to give an additional remedy to those who already had a remedy and deny any remedy to the great majority of patent holders affected who had no existing remedy whatever.

That part of the report of the Senate Committee on Finance, quoted by the majority, states that the provision under consideration "is broad enough to prevent *every type and form of unfair practice* and is, therefore, a more adequate protection to American industry than any anti-dumping statute the country has ever had." (Italics mine.) The term "unfair practice" is a broad one, broader than any similar term used in any statute except the one at bar, and one which the courts have not been called upon to construe or define. In my judgment, Congress, by section 337, intended to bring about the same or more far-reaching results, in the field of international commerce, than were accomplished by the Federal Trade Commission Act in the field of domestic trade.

It is well known that the products of patented processes and machines constitute a great majority of our internal and international commerce in goods which are dealt in under patent restrictions. The legislative history cited in the majority opinion indicates strongly that it was one of the purposes of the enactment to afford an additional and effective remedy to safeguard industries dependent upon patents. This the majority concedes. If the quotations from the legislative history in the majority

opinion are made for the purpose of suggesting that Congress did not intend to include as an unfair act in importation the importation of the product of an American patent process, as distinguished from patented articles, they certainly fall far short of doing so.

In the explanation of the purpose of section 337, Tariff Act of 1930 (19 USCA § 1337), the Tariff Commission speaks of *"infringements"* and suits against certain dealers. The report of the House Committee on Ways and Means speaks of "violations." The report evidently followed the suggestions of the Tariff Commission. The quoted information furnished by the Tariff Commission was not furnished to the Congress which first used the controverted term now at bar. The same language was used in the Tariff Act of 1922, and in the quoted statement by the Commission, according to the majority opinion (quoted from In re Orion Co., 71 F.(2d) 458, 22 C. C. P. A. (Customs) ——, T. D. 47123), the Commission was explaining the necessity of a provision in the Tariff Act of 1930 similar to the one in the Tariff Act of 1922, but which would be enforced by embargo alone instead of levying higher duties. It calls attention to the Tariff Commission's construction of the section, which construction it stated was then involved in an appeal to this court. That appeal referred to was the Frischer Case, supra, and in the Frischer Case, *the Tariff Commission had definitely held that the importation into this country of an article (bakelite) made abroad, in accordance with the process of an American patent, was an unfair method of competition and an unfair act in the importation of an article.* See finding No. 11 of the Tariff Commission in the Frischer Case. No attempt was made to get Congress, in the Tariff Act of 1930, to narrow the provision now under discussion, which was in the Tariff Act of 1922. So it is clear that when the Tariff Commission spoke of "infringements" and the committee spoke of "violations," they could not have had in mind a matter involving the tenuous contentions of appellant, because of the Commission's definite holding to the contrary. At the very most, the terms "infringements" and "violations" in the legislative history could not be regarded as even indicating more than the Tariff Commission's interpretation (contrary to its holding in the Frischer Case, supra, and contrary to its holding, later, in the Northern Pigment Company Case, supra) of the meaning of

the language which was found in both enactments. Surely, the Tariff Commission used those terms broadly. Congress did not use them at all. Are we warranted (even if this matter were in any sense controlling) in assuming that the Tariff Commission and the House Committee, in speaking of the two sections involved in the two acts, spoke with more precision than the Commission had employed in its written findings then on review, or this court employed in its expressions in the Frischer Case (which it now withdraws), and in later decided cases involving the application of the sections?

If I concluded, as the majority has concluded, that Congress did not intend that the importation into this country of an article made by a process or upon a machine protected by an American patent in this country might be prohibited, if such importation and the sale of the article tended to destroy an American industry, I would be forced to the conclusion also that it never intended that patent matters of any kind should be regarded as coming within this section at all. This is the real underlying view of appellant's counsel, as was disclosed at the oral argument here. If I concluded as the majority has concluded, I would be forced to agree with the conclusion reached by the author of the majority opinion in his dissenting opinion in the Frischer Case, supra, in which he, after pointing out clearly many reasons for his conclusion, said: "I am unable to find where, in section 316, or in any other act which Congress has ever passed, it evidenced any purpose to do such a thing as that, and, for that reason, I cannot agree with the majority that Congress in enacting the section had it in mind that alleged patent infringements should be dealt with under it. I feel that had it intended to do this, provision, in some way, would have been made for assuring a definite and legal finding upon any question of patent validity raised."

The unsoundness of the conclusion reached by the majority and the untenable character of appellant's argument is, I think, illustrated by the following found in appellant's reply brief: "Appellees argue, on page 10, that if the importation and sale of a *patented product* is an unfair method of competition, then they do not see why the importation and sale of an *unpatented product,* produced abroad by a process patented here, is not likewise an unfair method of competition. We are certain it is unnecessary to point out that the reason it is unfair in one case and not in the other is that in the case of a *patented* product the patent rights of the patentee are being violated, while in the case of the *unpatented product* the patent rights of the patentee are not being violated."

Appellant states that the importation of a patented product violates the rights of the patentee, while the importation of the unpatented product does not violate patent rights. The answer to this contention is very simple. The *importation* of the patented product does not violate anybody's patent rights, and is, in every sense, lawful, unless made unlawful by the act under consideration.

It follows that there is absolutely no justification for distinguishing between article patents and process patents, and appellant's frank admissions, in oral argument, in this case, amply support this view.

"Unfair competition" was a term involved in the Sherman Anti-Trust Act (26 Stat. 209, title 15, §§ 1-7, U. S. C. [15 USCA §§ 1-7, 15 note]) and the Clayton Act (38 Stat. 730, title 15, § 12 et seq. U. S. C. [15 USCA § 12 et seq.]), and its meaning had been defined by the courts. Congress then passed the Federal Trade Commission act, supra, containing the new term "unfair *methods of* competition". Concerning the said three acts, the United States Supreme Court in Federal Trade Commission v. Raladam Co., 283 U. S. 643, 648, 51 S. Ct. 587, 590, 75 L. Ed. 1324, 79 A. L. R. 1191, said:

"The bill which was the foundation of the act, as it first passed the Senate, declared 'unfair competition' to be unlawful. Debate apparently convinced the sponsors of the legislation that these words, which had a well settled meaning at common law, were too narrow. When the bill came from conference between the two Houses, these words had been eliminated and the words 'unfair methods of competition' substituted. Undoubtedly the substituted phrase has a broader meaning, but how much broader has not been determined. It belongs to that class of phrases which does not admit of precise definition, but the meaning and application of which must be arrived at by what this court elsewhere has called 'the gradual process of judicial inclusion and exclusion.' Davidson v. New Orleans, 96 U. S. 97, 104, 24 L. Ed. 616. The question is one for the final determination of the courts and not of the Commission. Fed-

eral Trade Comm. v. Gratz, 253 U. S. 421, 427, 40 S. Ct. 572, 64 L. Ed. 993; Federal Trade Comm. v. Beech-Nut Co., supra, 257 U. S. 441, page 453, 42 S. Ct. 150 [66 L. Ed. 307, 19 A. L. R. 882].

"The authority of the Commission to proceed, if that body believes that there has been or is being used any unfair method of competition in commerce, was then qualified in conference by the further requirement, not in the original bill,—'and if it shall appear to the commission that a proceeding by it in respect thereof would be to the interest of the public.' By these additional words, protection to the public interest is made of paramount importance, but, nevertheless, they are not substantive words of jurisdiction, but complementary words of limitation upon the jurisdiction conferred by the language immediately preceding. Thus the Commission is called upon first to determine, as a necessary prerequisite to the issue of a complaint, whether there is reason to believe that a given person, partnership, or corporation has been or is using any unfair method of competition in commerce; and, that being determined in the affirmative, the Commission still may not proceed, unless it further appear that a proceeding would be to the interest of the public, and that such interest is specific and substantial. Federal Trade Comm. v. Klesner, 280 U. S. 19, 28, 50 S. Ct. 1, 74 L. Ed. 138, 68 A. L. R. 838. Unfair trade methods are not per se unfair methods of *competition.* [Note the last expression.]"

The court there pointed out that Congress by the use of the additional term "methods of" meant something more than similar terms had meant in the other two acts, and proceeded to give a meaning to the term.

It is well-settled law that we should hold that Congress, when it used the new, broad, and *uninterpreted* language in the controverted provision, meant more than it did by the use of similar but narrower terms in prior enactments. The majority has wholly failed to observe this most compelling requirement. The reasoning and result of the opinion lead to the opposite conclusion.

While the language used in the prior enactments referred to, including the Federal Trade Commission Act, is in no sense as broad as the language used in the statute at bar, I think the holdings of the Supreme Court and other federal courts, hereinafter cited, compel the conclusion that the acts here complained of should be regarded as unfair acts within the meaning of the controverted provisions (and, as I see it, this is the only question necessary for decision here), and that in reviewing the Commission's holding we should "hesitate to reject the conclusion of the Commission, based as it is upon clear, specific and comprehensive findings supported by evidence." Federal Trade Commission v. Keppel & Bro., 291 U. S. 304, 54 S. Ct. 423, 427, 78 L. Ed. 814.

I desire to call attention to and briefly discuss the following cases: Federal Trade Commission v. Keppel & Bro., supra; Sears, Roebuck & Co. v. Federal Trade Commission (C. C. A.) 258 F. 307, 6 A. L. R. 358; Federal Trade Commission v. Winsted Hosiery Co., 258 U. S. 483, 42 S. Ct. 384, 66 L. Ed. 729; Federal Trade Commission v. Algoma Lumber Co., 291 U. S. 67, 54 S. Ct. 315, 320, 78 L. Ed. 655.

In the first case, the Supreme Court had, as one phase of the case, what I regard as the same question, in principle, which confronts us here, i. e., Did the Federal Trade Commission have the right to determine initially what constituted an "unfair method of competition?" After explaining that Congress, by the use of the "broader and more flexible phrase 'unfair methods of competition'" meant more than to aim at the acts which had been defined by the courts as "unfair competition," the court said:

"While this Court has declared that it is for the courts to determine what practices or methods of competition are to be deemed unfair, Federal Trade Comm'n v. Gratz, supra [253 U. S. 421, 40 S. Ct. 572, 64 L. Ed. 993], in passing on that question the determination of the Commission is of weight. It was created with the avowed purpose of lodging the administrative functions committed to it in 'a body specially competent to deal with them by reason of information, experience and careful study of the business and economic conditions of the industry affected,' and it was organized in such a manner, with respect to the length and expiration of the terms of office of its members, as would 'give to them an opportunity to acquire the expertness in dealing with these special questions concerning industry that comes from experience.' Report of Senate Committee on Interstate Commerce, No. 597, June 13, 1914, 63d Cong., 2d Sess., pp. 9, 11. See Federal Trade Comm'n v. Beech-Nut Packing Co.,

supra, 257 U. S. 441, at 453, 42 S. Ct. 150, 66 L. Ed. 307, 19 A. L. R. 882; compare Illinois Central R. Co. v. Interstate Commerce Comm'n, 206 U. S. 441, 454, 27 S. Ct. 700, 51 L. Ed. 1128. *If the point were more doubtful than we think it, we should hesitate to reject the conclusion of the Commission, based as it is upon clear, specific and comprehensive findings supported by evidence.*

· "We hold that the Commission correctly concluded that the practice was an unfair method of competition within the meaning of the statute. It is unnecessary to attempt a comprehensive definition of the unfair methods which are banned, even if it were possible to do so. We do not intimate either that the statute does not authorize the prohibition of other and hitherto unknown methods of competition or, on the other hand, that the Commission may prohibit every unethical competitive practice regardless of its particular character or consequences. *New or different practices* must be considered as they arise in the light of the circumstances in which they are employed." (Italics mine.)

When "new or different" acts in the *importation* of merchandise come before the Tariff Commission in accordance with the statute, it is its duty to determine whether or not they constitute "unfair methods of competition or unfair acts in the importation of articles." This court will then, as a matter of law, if called upon, determine whether such acts are such as are made unlawful by the statute.

It has been suggested that if Congress had intended the importation of the product of a patented process to have constituted an unfair act, it would have specifically so provided in the act. The impracticability and inadvisability of making such an attempt on the part of Congress is clearly explained in the Sears, Roebuck & Co. Case, supra, and I will not attempt to quote from that opinion. Moreover, the Supreme Court discussed this subject-matter in Federal Trade Commission v. Keppel & Bro., supra, and cited and referred to a report of the Senate Committee on Interstate Commerce, made by it when it reported the Federal Trade Commission bill to the Senate. The report, in part, is as follows: "The committee gave careful consideration to the question as to whether it would attempt to define the many and variable unfair practices which prevail in commerce and to forbid their continuance or whether it would, by a general declaration condemning unfair practices, leave it to the commission to determine what practices were unfair. It concluded that the latter course would be the better, for the reason, as stated by one of the representatives of the Illinois Manufacturers' Association, that there were too many unfair practices to define, and after writing 20 of them into the law it would be quite possible to invent others."

See, also, Federal Trade Commission v. Beech-Nut Packing Co., 257 U. S. 441, 42 S. Ct. 150, 66 L. Ed. 307, 19 A. L. R. 882.

The Federal Trade Commission to-day subdivides the unfair acts of competition into sixteen subdivisions.

It is conceded in this case, except as is hereinbefore indicated, that the importation of a patented article, which if made here would infringe an American patent, or if sold here could be prevented, is an unfair act and that this is true whether the importer did it openly or otherwise, and that it is true, even if the importer did not know that the article was protected by patent in this country. The majority will agree that, notwithstanding his innocence and ignorance, he has acted unfairly, but holds that if he imported the product of an American process patent knowing at the time that in this country he would not be permitted to manufacture it, and knowing that the practice would destroy American industry, as was true in In re Northern Pigment Co. et al., supra, he has not committed an unfair act. *The reason it is unfair for one to import a patented article protected by an American patent is because it puts the holder of the American patent at an unfair disadvantage and destroys the industry Congress was seeking to preserve, and the same reasons exactly apply to the importer of the product of an American process patent.*

The books are full of cases which sustain the holding by the Federal Trade Commission that certain methods were unfair under the new language used in the Federal Trade Commission Act which could not have been held to be unfair under any prior statute or under the common law. What is or is not unfair under the new language used must depend largely upon what Congress sought to accomplish by the legislation.

In Federal Trade Commission v. Klesner, 280 U. S. 19, 50 S. Ct. 1, 74 L. Ed. 138, 68 A. L. R. 838, it was definitely held that the Federal Trade Commission

Act was not intended as a means of enforcing private rights. So it is with the provisions at bar; private rights are not concerned. The existence and welfare of American industry are to be given paramount importance.

To hold as the majority holds that the acts complained of here do not constitute unfair acts under the new language used, because the courts have not heretofore held them to be such, is unquestionably out of line with numerous Supreme Court and other federal court decisions, some of which I have hereinbefore cited and discussed.

Let us take the facts in Federal Trade Commission v. Keppel & Bro., supra. The Keppel firm was one of numerous candy manufacturers who manufactured and sold what was known as "break and take" packages, in some of which packages a penny was placed, and the child purchasing this particular package would, therefore, get his candy free. The Supreme Court of the United States held that there was no deceit and that there was no fraud, and that other candy dealers could do the same thing and protect themselves, but that notwithstanding these facts it amounted to an unfair method of competition under the new language used in the Federal Trade Commission Act. On the very question which is the controlling one here, the court said:

"Although the method of competition adopted by respondent induces children, too young to be capable of exercising an intelligent judgment of the transaction, to purchase an article less desirable in point of quality or quantity than that offered at a comparable price in the straight goods package, we may take it that it does not involve any fraud or deception. It would seem also that competing manufacturers can adopt the break and take device at any time and thus maintain their competitive position. From these premises respondent argues that the practice is beyond the reach of the Commission because it does not fall within any of the classes which this Court has held subject to the Commission's prohibition. See Federal Trade Comm'n v. Gratz, 253 U. S. 421, 427, 40 S. Ct. 572, 64 L. Ed. 993; Federal Trade Comm'n v. Beech-Nut Packing Co., 257 U. S. 441, 453, 42 S. Ct. 150, 66 L. Ed. 307, 19 A. L. R. 882; Federal Trade Comm'n v. Raladam Co., 283 U. S. 643, 652, 51 S. Ct. 587, 75 L. Ed. 1324, 79 A. L. R. 1191; Federal Trade Comm'n v. Royal Milling Co., supra,

at page 217 of 288 U. S., 53 S. Ct. 335, 77 L. Ed. 706. But we cannot say that the Commission's jurisdiction extends only to those types of practices which happen to have been litigated before this Court.

"Neither the language nor the history of the act suggests that Congress intended to confine the forbidden methods to fixed and unyielding categories. The common law afforded a definition of unfair competition and, before the enactment of the Federal Trade Commission Act [see 15 USCA §§ 41–51] the Sherman Anti-Trust Act (15 USCA §§ 1–7, 15 note) had laid its inhibition upon combinations to restrain or monopolize interstate commerce which the courts had construed to include restraints upon competition in interstate commerce. It would not have been a difficult feat of draftsmanship to have restricted the operation of the Trade Commission Act to those methods of competition in interstate commerce which are forbidden at common law or which are likely to grow into violations of the Sherman Act, if that had been the purpose of the legislation."

Fraud, deception, intentional wrongdoing, or damage flowing therefrom, need not be shown, even under the narrower Federal Trade Commission practice, which relates only to competition. Federal Trade Commission v. Algoma Lumber Co., supra; Federal Trade Commission v. Winsted Hosiery Co., supra. In the Algoma Lumber Co. Case, supra, where California pine was sold as white pine and the trade generally understood that California pine was not the regular white pine, it was said:

"The Commission made no finding as to the *motives* animating the respondents in the choice of the contested name. The respondents say it was chosen to distinguish their variety of yellow pine from the harder yellow pines native to the southern states. We may assume that this is so. The fact remains, however, that the pines were not white either botanically or commercially, though the opportunity for confusion may have been comparatively slight when the sales were restricted to customers in local markets, buying for home consumption. Complaints, if there were any, must have been few and inarticulate at a time when there was no supervisory body to hold business to its duty. *According to the law as then adjudged, many competitive practices that today may be suppressed* (Federal Trade Comm'n v. Winsted Hosiery Co., su-

pra), were not actionable wrongs, the damage to the complainants being *classified often as collateral and remote.* American Washboard Co. v. Saginaw Mfg. Co. (C. C. A.) 103 F. 281, 286, 50 L. R. A. 609. * * * (Italics mine.)

"Competition may be unfair within the meaning of this statute and within the scope of the discretionary powers conferred on the Commission, though the practice condemned does not amount to fraud as understood in courts of law. Indeed there is a kind of fraud, as courts of equity have long perceived, in clinging to a benefit which is the product of misrepresentation, however innocently made. Redgrave v. Hurd, L. R. 20 Ch. D. 1, 12, 13; Rawlins v. Wickham, 3 De C. & J. 304, 317; Hammond v. Pennock, 61 N. Y. 145, 152. That is the respondents' plight to-day, no matter what their motives may have been when they began. They must extricate themselves from it by purging their business methods of a capacity to deceive."

So, it does not make any difference in the case at bar whether the importer had knowledge or did anything knowingly which was unfair when his conduct alone is considered, but the question is presented: *Does the importation so made result in an unfairness to the American industry which Congress sought to protect?*

In Federal Trade Commission v. Winsted Hosiery Co., supra, the respondent sold to retailers and jobbers, and used the term "merino" as applied to underwear which was not all wool. The retailer and the jobber understood and were not deceived. The manufacturer did not intend to deceive any one, and did not deceive any one, and yet, largely on account of the consideration existing in the case that the manufacturer was putting into the hands of the retailer and the jobber a matter which enabled them to unfairly increase their own sales, it was held that the whole situation presented an unfair method of competition.

The Winsted Hosiery Co. Case is strictly in point on the issues at bar. The innocent importer (and it is not claimed that the importer is innocent in the instant case) puts into the hands of the competitors of appellees the instrument to take away their trade not only by underselling them, but by truthfully stating that it is the same merchandise, and that it is made by the same process as appellees. The remedy provided for in the statute at bar is not against an *individual* because of any unfair conduct on his part, but is against the goods, because of the unfairness which the American industry will suffer as a result of Amtorg manufacturing something in Russia and selling it here, which it could not manufacture here and sell.

Surely, what the Supreme Court, in these cases, said with reference to the effect of the addition of the term "methods of" in the Federal Trade Commission Act, applies with much more force to the language here under consideration. The term used in section 337 (a), 19 USCA § 1337 (a) is not only unusually broad, but is in a field of legislative endeavor never before entered. This proceeding is in the nature of an action against property (in rem) as distinguished from equity actions in the cited cases which were actions in personam. In the light of the Keppel & Bro. Case, supra, and the other cases discussed, can there be any reasonable doubt as to what the Supreme Court would have held if it had been called upon to decide the Northern Pigment Company Case, supra, or the case at bar?

I will not dwell upon a discussion of who the Amtorg Trading Corporation is, or how it operates for the Soviet government of Russia. All those things are matters which are pretty generally understood and have little, if any, real bearing on the issues here involved. It is admitted in this case, so far as we are concerned, that the phosphates, apatite, etc., are made in Russia, in accordance with the processes of the American patents involved, and that if one attempted to produce the same goods by the same processes in this country, the owners or licensees of the patents could stop such production as an infringement; that the acts complained of have the effect or tendency of substantially injuring or destroying an American industry which is efficiently and economically operated; and that the phosphate rock from Russia was delivered at Baltimore for $6 a ton, which was $1.57 a ton below the average cost of phosphate rock delivered at that port from the mines in Florida. Some of the complainants are lessees of the owners of the patents and necessarily have to pay high royalties under their leases, which fact alone unduly handicaps such American producers when unfairly thrown into competition with a product made by such processes without the royalty expenditure. Is it fair to tie American industry with patent restraints and then permit the free importation of the same product, produced by the

same process, under the circumstances at bar, and thus destroy the American industry? More precisely, is it a *fair act in importation* for a foreign-controlled company to destroy an American industry by importation and sale when it could not do so legally by manufacture and sale here? Since the Supreme Court holds that legally selling a penny with a piece of candy, without fraud or deceit, is an *unfair method of competition in trade,* why should this court not sustain the Tariff Commission in its holding that the acts complained of were *unfair methods of importation and unfair acts in the importation* of apatite?

It must be remembered that *it is conceded in this case, and properly so, not only by the majority, but by the parties, that if the holding in the Northern Pigment Company Case was sound, it controls the decision in this case, and that the facts in this case and the facts in the Northern Pigment Company Case cannot be distinguished in principle.* Notwithstanding this fact, it may be suggested that the record at bar does not show such an extreme case of *unfairness* as was shown in the Northern Pigment Company Case. In that case, it was shown that Americans who had been engaged in the manufacture of pigment in the United States, and employed by a company operating under the American patent quit their employment and went to nearby Canada where they could operate under the process without paying royalty, and that they there manufactured and caused to be shipped to this country pigments which could be sold at such a price as to wholly destroy the American industry if such unfair acts were continued. We there held that the importation into this country of pigments, so made, fell within the term used in said section 337. If this was true in the Northern Pigment Company Case, where they knowingly damaged the American industry, it must also be an unfair act if the importer of the goods, so produced, did not know how they were produced. In other words, Congress could not have distinguished between importers who knew of the facts and those who did not. The effect upon the American industry was the same, and, regardless of the knowledge of the importer, the industry which Congress sought to protect would suffer the same disadvantages in either instance. If we were, in cases like the one at bar, required to make a distinction between an importer who knew all the facts relating to processes and one who did not know them, we would also be required to make the same holding in cases like the Frischer Case, where article patent claims were involved. The purpose of the law would be evaded by the transfer of goods to so-called innocent purchasers, and perjury and fraud would be encouraged. But, regardless of this consideration, no one has ever said, or ever will say, that the acts complained of in the Northern Pigment Company Case were *not in fact unfair* or that the importers in that case were innocent purchasers who had no knowledge of how the pigment was made.

The majority opinion in holding that the acts complained of here and in the Northern Pigment Company Case were not *unfair* seems to rest upon the proposition that no decided cases hold that such acts constitute unfairness. It is pertinent here to note that there is no decision cited, and I am sure that there can be none cited, which holds that acts such as the one at bar are not unfair and that there is, therefore, a lack of supporting authority for the majority opinion.

In the opinion, however, attention is called to the fact that appellant in its brief points out that in 1852 a bill was introduced in the United States Senate which would have made illegal the importation of the product of a patented process or the product of a patented machine, and that the bill was discussed by various Senators, but was never enacted into law. The majority then points out that no legislation of similar character has ever since been enacted into law.

Because of the unusualness in resorting to this kind of matter as proper for consideration in the decision of a case, and because of its apparent immateriality, I have examined the cited references and others relating thereto with some care. Such a bill was introduced in the Senate, and, in explaining it, it was said that the patentee of a machine for making wooden shoe lasts, then used largely in New England, was being deprived of his patent reward by the importation from Canada, nearby, of such lasts made in Canada on the patented machine. An amendment was offered to confine the prohibition of the imported articles to those made of wood. This was discussed and rejected. The bill passed the Senate on the 8th day of February, 1853. I find no record of the bill ever being reported in the House, and since that term of Congress adjourned on the 3d of March,

1853, it is not difficult to understand why the measure did not become a law. In view of the particular evil aimed at, many inter-, vening circumstances could have happened which would have rendered the passage of the law unnecessary. But if by any stretch of the imagination it can be concluded that that Congress deliberately decided against the general policy of prevention by law of the importation of a product of a patented process, or a patented machine, it is difficult to understand why that would throw any light whatever upon the question as to whether Congress, when it enacted the provision under consideration, did or did not intend that the term used should be authority for the prevention of importations such as are at bar.

Notwithstanding what is said by the majority with reference to this court's consideration, in prior cases, of the differences between process claims and article claims in patents as affects the issue here, an examination of appellant's brief in the Northern Pigment Company Case, supra, discloses that it was there definitely pointed out that a remedy was afforded in infringement suits where article claims were involved which was not afforded where process claims were involved. It is true that the authorities cited here were not cited there, and that this point was not stressed in that case, like it is in the case at bar. The question was, however, argued before and decided by the Tariff Commission in the Frischer Case, supra, and on appeal here it was discussed in appellant's brief, and some of the authorities cited in the instant case were there cited.

The issue presented here by appellant is not new. It has been before this court in the Frischer Case and in the Northern Pigment Company Case. Obviously, it was not there regarded as of sufficient importance to give it any consideration, let alone controlling consideration.

If the majority means to hold, and I am not sure that it does, that the acts complained of are not *unfair* because the importer himself is not shown to have knowingly done the unfair thing, to. a particular individual or an industry, such a holding would not only take from the operation of section 337 (a), supra, all patent matters, but would bring about the complete nullification of the whole provision. It must be remembered that there are many other unfair acts in importation aimed at by the provision. It is common knowledge that the simulation by foreign manufacturers of unpatented and untrade-marked American produced packages and articles is a matter of the gravest concern in our international commerce to-day. Under the holding of the majority, would it be unfair for an innocent purchaser to buy an attractive package in Japan, which simulated an American package, not knowing what kind of similar packages were sold in America, and import it into this country? Could that practice be stopped at the ports under section 337? Not if we are to judge the unfairness by the mental attitude of the importer. But it certainly would be unfair to the American producer of similar goods to permit such a practice, and I think it is clearly within the intent of the provision.

Let us suppose, after this court's opinion in this case is handed down, that the Federal Trade Commission should issue an order against the Amtorg Company, to desist selling the apatite at bar on the theory that it was embraced within the term "unfair methods of competition." In the light of the above cases, and if the unfairness was the only consideration, is there any doubt as to what it would hold and would be justified in holding? If it is unfair to sell it (although it could not be stopped by an infringement action because the sale does not infringe anything), would it also be unfair to import it? Let us keep in mind that Congress sought to protect the American industry by stopping such transactions at the port of entry and thus avoid multiplicity of actions and vain attempts with inadequate remedies.

The majority opinion says: "If some of the suggestions which have been offered during consideration of this case were carried to their logical conclusion, it would seem to follow that the importation of any merchandise the cost of which to the importer was lower than the price he would have to pay for a similar or competitive article produced in the United States would constitute an unfair method of competition within the purview of section 337, supra."

The finding of the Commission that the acts complained of were within the controverted provision would clearly lead to no such unjustifiable conclusion as is above indicated. Congress, in many places in the act, has recognized the existence of such a situation and has attempted to take care of it by levying a duty which, at least theoretically, equalizes the costs of production. Congress also made special provision for

this subject-matter in the flexible tariff provision in the act. By section 337 (a), 19 USCA § 1337, Congress was not aiming at lower production costs unless such costs involved an element of unfairness, such as clearly appears from the record in this case and in the other cited cases of this court involving section 337 (a).

I do not contend for any construction of section 337 (a) that ignores the word "unfair," but I do most earnestly insist that, in determining what is unfair under the new, broad language used, we must not lose sight of the expressed purpose of the act —to save American industries. We should unhesitatingly hold that an evasion of our patent laws by manufacturing abroad what could not be manufactured here is unfair to American industries which are tied by patent restrictions.

The findings of the Commission which are here involved should be affirmed.